ELIZABETH AIKEN v. PENNSYLVANIA R. CO.

APPEAL BY DEFENDANT FROM THE COURT OF COMMON
PLEAS NO. 1 OF ALLEGHENY COUNTY.

Argued October 30, 1889—Decided November 11, 1889.
[To be reported.]

1. The rule, that, before crossing a railroad track, a person must stop, look and listen, applies to persons walking equally as to persons driving. It is not a rule of evidence, but a rule of law, peremptory, absolute and unbending; and a failure so to stop is not merely evidence of negligence, but negligence per se.

2. When, in an action against a railroad company for the negligent killing of a person at a street crossing, the uncontradicted evidence for the plaintiff is, that the deceased was killed while voluntarily attempting to cross in front of a train, the approach of which he had seen while in a place of safety, the court should nonsuit or direct a verdict against the plaintiff.

3. The doctrine that a man in a position of danger is not responsible for the results of an error of judgment committed in his attempt to get out of it, is to be taken with the essential qualification that he must have gotten into the danger without negligence or fault of his own: Penna. R. Co. v. Werner, 89 Pa. 59, distinguished.

4. Evidence, in this case, as to the speed in which trains usually ran over a certain crossing was not admissible upon the issue whether or not a particular train was run over it at a negligent rate of speed, nor was it rendered admissible by testimony that the train in question was going at about the usual rate.

Before PAXSON, C. J., STERRETT, GREEN, CLARK, WILLIAMS, McCOLLUM and MITCHELL, JJ.

No. 70 October Term 1889, Sup. Ct.; court below, No. 570 March Term 1888, C. P. No. 1.

On March 5, 1888, service was accepted of a summons in trespass brought by Mrs. Elizabeth Aiken against the Pennsylvania Railroad Company, to recover damages for the alleged negligent killing of her husband, Samuel B. Aiken, by the defendant company. The defendant pleaded not guilty.

At the trial on January 21, 1889, the following facts were shown:

About nine o'clock on the evening of January 16, 1888, the

plaintiff's husband was walking upon Penn avenue, in the borough of Wilkinsburgh, on his way home, in company with William D. Irwin. They were walking in the middle of the street on account of the slippery condition of the sidewalks. Penn avenue is a part of the old turnpike road leading from Pittsburgh to and beyond Greensburg, in Westmoreland county, and is a much traveled thoroughfare.

The defendant company's railroad crosses this street in Wilkinsburgh at grade. At the point of crossing the defendant has four main tracks and seven side tracks. Two of the latter, lying between the main tracks and the remaining five side tracks, are unused. They are very short, extending but a few feet beyond the crossing of the street and then terminating. They were designated in the testimony as "spur tracks." The eleven tracks together make a roadbed 153.5 feet in width, and occupy that much of the length of Penn avenue.

Aiken and Irwin, in proceeding eastwardly along the avenue, reached this crossing and started to pass over it. It was a dark and cloudy night, and a wind was blowing from the west. There was no watchman at the crossing, and no gates or other appliances for giving warning of the approach of trains. Standing on one of the tracks, at the right hand side of the street, was a train, the engine of which was blowing off steam. In crossing the railroad the deceased and his companion first encountered the five side tracks used by the defendant. While passing over these, their view of the main tracks in the direction of Pittsburgh, which lay to their left, was obstructed by loaded cars and piles of pipe and railroad ties, upon and near to the side tracks, a short distance from the street. The last of these tracks was forty-five feet distant from the first of the main tracks. A part of this intervening space was occupied by the two spur tracks, between which and the nearest main track was an unoccupied space twelve feet in width. As soon as the spur tracks were reached, an unobstructed view along the main tracks, in the direction of Pittsburgh, for a distance of half a mile, could be had.

While crossing the first main track, Aiken was struck and killed by the Braddock Accommodation, a passenger train coming from Pittsburgh. The circumstances surrounding the accident were thus related by Irwin, testifying for the plaintiff:

Statement of Facts.

Q. Describe to us what occurred there, as near as you can ?
A. We were coming up in here; when we come to the track
we noticed a train coming.

Q. That is, to the main track?· A. Yes, sir; and it was
pretty close before we seen it, and Mr. Aiken attempted to go
on and I stopped. I said, " We had better stop," and he says,
" Come on, we can get across," and he started and I stopped.
I had attempted to get across and by the time I was at the
track I could lay my hand on the engine.

Q. He was a little ahead of you? A. Yes, sir; he was
about a reach ahead of me.

The witness further testified that when he first noticed the
train it was very close to them, not over thirty feet away, he
thought; that it did not seem to be making much noise, and
he heard no bell or whistle ; that the witness was looking out
while crossing the tracks, though he was watching more par-
ticularly in the direction whence he heard the noise of escaping
steam ; that the noise of this steam and the obstructions on the
side tracks to his left might to some extent have prevented his
hearing this train until he got near to the main track ; that when
he saw the train coming, he could not tell certainly whether he
had already crossed, was still on, or had not yet reached the
track on which it was running, and he did not then know, and
could not tell in the darkness of the night, whether the two
tracks at the centre, which he afterwards learned were spur
tracks, stopped at the crossing or extended on ; that he had
but a very short time to think, and could not tell, whether it
was the best thing to go on or to go back, and, as Aiken went
on, the witness attempted to do so too; that the train " was
going about the usual rate of speed," " about what it runs be-
tween stations."

On cross-examination the witness testified :

Q. Your attention was attracted to that train before you
got on to the track ? A. We were very close to it when my
attention was attracted to the train ; we were right almost in
front of it and it wasn't—

Q. You were not on the track ? A. No, I was not on the
track.

Q. And you told Mr. Aiken to stop? A. Yes, sir; I said
we had better stop here.

Q. Did you catch hold of him? A. I think I caught him by the coat sleeve; he said " come on, we can get across," and he turned around, which might have detained him a little bit; but he went right on.

Q. And you stopped? A. Yes, sir.

Q. Did you see him struck? A. No, sir; I didn't know he was struck for certain until we found him.

Q. You think he got pretty near over? A. I thought he got over.

Q. That was your impression at the time, that he had gotten over? A. At the time I thought he had got across.

On re-direct examination the witness was asked whether he could hear the train until he got past the obstructions upon the side tracks, and answered: " Possibly we might have, if we had been paying particular attention; we were talking and I didn't notice."

On re-cross-examination he stated that there was nothing to prevent his seeing the train after he had passed over the sidings on which cars were standing, if he had " looked down that way."

Thomas Snowden testified for the plaintiff as follows:

Q. In running over this crossing at what rate of speed did the trains usually run?

Objected to as incompetent and irrelevant, the speed of this particular train being the question.

By the court: Objection overruled; exception.[6]

A. I traveled on that a great deal, and I thought that they went across the Penn avenue crossing just as fast as they did at other places.

By the court: Q. Do you know about what rate of speed they made usually? A. I am not familiar with the number of miles that they make to the hour or to the minute.

By Mr. Kirker: Q. Were they in the habit of slowing up when they came to that crossing? A. Not that I know of; as a general thing they slow up just after they pass the crossing to make the stop at Wilkinsburgh station.

For the defendant, Samuel Scott, the engineer of the train by which the deceased was killed, testified that the train was running at the average speed of fifteen to eighteen miles an

hour; that he sounded the whistle for the Penn avenue cross-
ing, as usual; that the fireman rang the bell, commencing when
the engine was at least one hundred feet away from the cross-
ing; that when he was about fifty feet from the crossing the
witness pulled out his watch, and during the time he was look-
ing at it the engine passed over the crossing; that the witness
saw nothing of the deceased, and did not know that he was
struck until, at the end of the run, a hat was discovered on the
pilot of the engine, from which it was inferred that some one
had been injured during the run; that the head-light of the
engine was so constructed as to concentrate the light on a space
of about forty-five feet along the track, commencing about fif-
teen feet in advance of the pilot. Other testimony was given
in corroboration of that of the engineer.

At the conclusion of the testimony, the court, SLAGLE, J.,
charged the jury in part as follows:

Before going into any general statement in reference to the
case, I will answer the points submitted to me by the parties.
I am asked by the plaintiff to instruct you [inter alia]:

1. If you find from the evidence in this case that the plaint-
iff's husband was killed by the defendant's train whilst upon
the Penn avenue public crossing in Wilkinsburgh borough, and
that the view from the approach to this crossing, from the di-
rection he was traveling at the time of the accident, was then
so obstructed by buildings erected within and cars standing
upon defendant's tracks or switches, and by piles of iron pipe
placed on defendant's property, and darkness of night or other-
wise, that it was impossible for him to see, and by reason of
locomotive of defendant company blowing off steam near the
crossing, difficult if not impossible for him to hear an approach-
ing train from the direction this one came, until he had passed
more than half way over the crossing and came too near or
upon the defendant's through tracks, and that the deceased
either did not know, or from the darkness of the night was
unable to discover which of the ten or eleven tracks at the
crossing were the through tracks, then he was not bound to
stop, look and listen before entering upon the crossing. And
if you further find that when he got too near or upon the
through tracks the defendant failed to ring the bell, sound the

Charge of Court below.

locomotive whistle, or give other timely notice of the rapidly approaching train, so as to give deceased sufficient time to ascertain the track upon which it was coming and to get out of its way, and for that reason alone he was run down and killed by the train, defendant is liable and your verdict must be for the plaintiff.

Answer: Refused, so far as not affirmed in the general charge. The point involves questions of fact for the jury, and must be considered in connection with all the testimony bearing upon the negligence of both parties.

Counsel for defendant respectfully request the court to charge the jury as follows :

1. That, under all the evidence in this case, their verdict must be in favor of defendant.

Answer: Refused.[1]

2. That if the jury believe the testimony of the plaintiff's witness, Irwin, that the deceased did not stop, look, and listen, before attempting to cross the defendant's tracks, their verdict should be for the defendant.

Answer: Refused.[2]

3. That it was Aiken's duty to stop, look, and listen before attempting to cross the tracks ; and if the jury should find from the evidence that he did not do so, their verdict should be for the defendant.

Answer: Affirmed, unless the jury find from the evidence that the circumstances excused him from the duty, and his failure to do so did not contribute to the accident.[3]

4. That even if the jury believe from the evidence that there were cars standing on the side tracks which obstructed Aiken's view, if they also find that it is true, as testified to by plaintiff's witness Edeburn, that there was a clear space of over forty feet between the last track occupied by cars and the track on which Aiken was struck, and that from any point on the Penn avenue crossing for that distance of forty feet he could have seen the train had he looked, then he was guilty of contributory negligence, and their verdict should be in favor of the defendant.

Answer: Refused; this is a matter for consideration of the jury.[4]

Now, gentlemen, as stated, the first question for you to de-

termine is, was the defendant in this case guilty of negligence which caused the accident and death of Mr. Aiken? What is negligence is a matter which must, as a rule, be left to the jury. It simply means the want of such precautions as persons of ordinary prudence and care take, under the special circumstances of the case, to prevent injury to others. So that there can be no definite rule laid down that will govern every case; but it must be left, ordinarily, to the jury to determine, whether, under the particular circumstances of the case, there was anything omitted which should have been done, or anything done which should not have been done.

In determining the question of the negligence of the defendant you will take into consideration all the circumstances surrounding the place where the accident occurred. What would be reasonable care under one state of facts would be gross negligence, possibly, under another state of facts. . . . . It is the duty of the plaintiff to make out to you satisfactorily that the defendant's employees were guilty of negligence in the performance of their duty; and furthermore that this negligence was the cause of this accident. If you fail to find that, you may stop there and return a verdict for the defendant. But if you find that the defendant's employees were negligent in the performance of their duties, under all the circumstances of the case, you then consider the testimony with reference to the actions of the deceased, because, as has been said to you by counsel, if the negligence of the deceased in any way contributed to the accident, then the plaintiff is not entitled to recover. . . . . Now, the testimony upon that point is that of one witness only. There is nothing material bearing upon the question except the testimony of Mr. Irwin, who was the only person, so as far the testimony discloses, who saw this accident or knew anything at all about it. It is not at all remarkable that the persons on the train did not ascertain it, until they got to their stopping place at the end of their run. A train passing at that rate of speed, and striking a man and knocking him off to the side of the track, would have had such a slight obstruction that the persons on the train would not have noticed it whatever. If they had run over him they would possibly have noticed the jolt, but merely striking him and knocking him off the track would be so slight an impediment to the train that it would

not be observed at all. And, furthermore, the evidence is that these parties were very close to the train and got upon the track when it was almost passing the crossing. Another matter that was referred to, as showing negligence on the part of the engineer is, that he pulled out his watch to look at the time. He says that was done after the bell had commenced ringing, and when he was within forty or fifty feet of the crossing. In fact, he said it was while he was passing over the track, and as you will see, that is but a brief space of time. If the deceased then got upon the crossing, any precaution he would take would not prevent an accident, because he could not stop his train by any possibility. Therefore, he had done his duty if he looked forward to see if the track was clear before he got on the crossing.

[In reference to the duty of the deceased, it was his duty to do everything that a reasonably prudent man, regardful of his own life, would do to prevent accident, and the question here is, did he? Ordinarily the rule of law is as defendant's counsel requested me to instruct you, that a man before crossing a railroad track must stop, look and listen. It is so laid down in a number of cases. I think that it is usually applied, however, to parties who are driving, and not to parties walking. It is after all not a rule of law, but a rule of evidence only, and therefore the duty of stopping is always a question for the jury. I can say to you, as a question of law, that a man is never relieved, under any possible circumstances, from looking and listening. A man has no right to shut his eyes or stop up his ears and go into danger; and if he does, he must take the consequences and not ask any person else to pay damages for the injury done. But the question of stopping is a question which must be left, under all the circumstances, to the jury; and therefore I leave it to you in this case to say whether or not the plaintiff ought, under the circumstances, to have stopped anywhere upon this railroad, or before going upon it.] [5] Whether or not he ought to have stopped, he was not relieved, could not be relieved in any way, from the duty of looking and listening; and if, by looking and listening, or stopping, he could have avoided this accident, you have no right to give a verdict in favor of the plaintiff.

Now, the excuse for not stopping is, that there are eleven

tracks across this highway; that upon one side there was a train standing with an engine attached blowing off steam; on the other side, there were cars standing upon the tracks, and there is evidence that at one point there were pipes and ties piled up. As to the permanent obstructions, the evidence is clear that they did not obstruct the view for at least nine hundred feet, standing at a point twenty-five feet west of the first of these side tracks; and that would be far enough for a person to see a train. But the excuse for not seeing it is that on this particular night there were some piles of iron; according to the engineer, those piles of iron would limit that view to a distance of about six hundred feet. So that, as to any obstructions, unless it be these cars that were on the track, there was a clear way of at least six hundred feet that could have been seen before going upon any of the tracks. But the plaintiff's testimony indicates that there were cars standing on one of the tracks, which one the witness was unable to state, but he says that that prevented them from seeing down the road until they had got on the tracks. On the right hand side, was this train with the engine attached which obstructed the view to some extent that way. He says that they passed on to the tracks, and after crossing a number of them that this train was upon them, as he says, within thirty feet of them before they observed it. Now, it is for you to say whether or not after passing those cars, because he was bound to keep his eyes open all the time, if he had looked, if he had listened, would he have seen or heard this train? If so, then he was negligent in not seeing it before it reached within thirty feet of them. That is one element of negligence on his part. You will determine that question. As I say, they had no right to go over there without looking, and if they had looked, how far could they have seen the light after passing these cars? According to the testimony, they had forty-five feet, at least, if the cars were on the farthest of these tracks; they had forty-five feet to go before they struck the track upon which this train was coming, and after passing those cars, by looking, they could have seen to Brushton station. Now, Mr. Irwin says that they did not see it until it was within thirty feet. I think he is mistaken about the distance. It is impossible that that could be, because he says that after he saw the train he stopped; Mr. Aiken said "come on, we can get

across," and started to go across, and he (Irwin) caught him by the sleeve, and he turned, he halted a little, probably enough to cause the accident; he might have gotten over. A train running at fifteen miles an hour runs twenty-two feet every second, and if it was only thirty feet away it was only one and a half seconds after they saw the train before Mr. Aiken went across; so that it must have been further away than that.

Then comes another question: After they had seen it, was he guilty of a lack of caution in attempting to get over? Now, that depends somewhat on the circumstances, as I have said. If they came upon the tracks without any negligence upon their part, without having omitted to do what they ought to have done, and then while the danger was upon them, suddenly, without being caused by their negligence, they mistook which course was the prudent one, which course was the safe one, he would not necessarily be guilty of negligence. But if they had time to see how far that train was off, and he undertook recklessly to go in front of it, it was negligence on his part, and the plaintiff ought not to recover. Now, it seems to me this gives you the general ideas. I have not attempted to give all the facts and circumstances bearing upon this matter, but just simply such as will give you a general idea of how you will consider the case. . . . .

The jury returned a verdict in favor of the plaintiff for $3,500. Judgment having been entered, the defendant took this appeal, assigning for error :

1-4. The answers to defendants' points.[1 to 4]

5. The part of the charge embraced in [ ] [5]

6. The admission of the plaintiff's offer.[6]

Mr. *George B. Gordon* (with him Mr. *John H. Hampton* and Mr. *William Scott*), for the appellant:

1. The evidence produced to prove negligence of the defendant was hardly, if any, more than a mere scintilla; but we do not propose to take up time in arguing this point, and pass at once to the duty of the deceased. He was clearly guilty of contributory negligence. The presumption of law that he stopped, looked and listened, was gone, after his companion, Irwin, testified that he did not do so. It then became an undisputed fact

in the case that he did not stop: Reading etc. R. Co. v. Ritchie, 102 Pa. 425. This fact is necessarily fatal to the plaintiff's case. The decisions are uniform to that effect, from North Penna. R. Co. v. Heileman, 49 Pa. 60, to Greenwood v. Railroad Co., 124 Pa. 572.

2. An attempt was made to avoid this rule in the present case by showing that the view of the deceased was obstructed by cars standing upon the first track he came to. But the fact that he could not see, is no excuse for not stopping to listen. The cases are uniform to the contrary. The more difficult it was to see, the greater the necessity and duty to stop and listen: Penna. R. Co. v. Beale, 73 Pa. 505; Gerety v. Railroad Co., 81 Pa. 277; Penna. R. Co. v. Ackerman, 74 Pa. 265; Greenwood v. Railroad Co., 124 Pa. 572. Moreover, the uncontradicted evidence is, that while anywhere within forty-five feet of the track on which he was killed, the deceased had an unobstructed view, for more than half a mile, in the direction of the approaching train, and could not have failed to see it, had he looked.

3. There is no uncertainty in the law as to a traveler's contributory negligence when he steps in front of a train in full sight: Carroll v. Railroad Co., 2 Penny. 159; Moore v. Railroad Co., 108 Pa. 353; Morgan v. Railroad Co., 23 W. N. 189; Penna. R. Co. v. Bell, 122 Pa. 58; Marland v. Railroad Co., 123 Pa. 487. His failure to stop is negligence per se: North Penna. R. Co. v. Heileman, 49 Pa. 60; Greenwood v. Railroad Co., 124 Pa. 572. If the court was right in charging that the rule as to stopping, looking and listening does not apply to a man on foot, the cases of Nagle v. Railroad Co., 88 Pa. 35; Carroll v. Railroad Co., supra; Moore v. Railroad Co., supra; Penna. R. Co. v. Coon, 111 Pa. 430; Penna. R. Co. v. Bell, supra, and Marland v. Railroad Co., supra, were all wrongly decided, and the rule is stricken down in the very cases where it is most easily complied with and gives the most absolute protection.

4. Nor is this rule a question of evidence for the jury. Its enforcement is not to be left to their caprice, and the court should not have submitted to them whether the deceased ought under the circumstances to have complied with it: Penna. R. Co. v. Beale, 73 Pa. 505; Greenwood v. Railroad Co., 124 Pa. 572. Moreover, the court ought not to have allowed the plaint-

iff to prove the speed at which trains usually ran over this cross-ing. The question was whether this particular train was run at an improper and negligent rate of speed, and the fact that the defendant ran other trains on other days at a rapid rate was not competent: 1 Whart. on Ev., § 40; Balt. etc. R. Co. v. Colvin, 118 Pa. 241.

*Mr. J. W. Kirker*, for the appellee:

1. "Culpable negligence is the omission to do something which a reasonable, prudent and honest man would do, or the doing of something which such a man would not do, under all the circumstances surrounding the particular case:" Johnson v. Railroad Co., 70 Pa. 366; Kay v. Penna. R. Co., 65 Pa. 273; Shear. & Redf. on Neg., § 7; Wharton on Neg., §§ 1, 2, 3. It is the absence of care according to the circumstances, and is always a question for the jury when there is reasonable doubt as to the facts, or as to the inferences to be drawn from them: Penna. R. Co. v. White, 88 Pa. 327. In view of the uncontro-verted evidence as to the place where and the time when this accident occurred, and all the facts and circumstances surround-ing it, including those stated in the testimony of the engineer, the court could not say, as matter of law, that the defendant was not negligent. The obstruction of the deceased's view by standing cars was negligence: Penna. R. Co. v. Ackerman, 74 Pa. 265.

2. Nor could the court have decided, as matter of law, that the deceased was guilty of contributory negligence. The in-ferences of fact to be drawn from the testimony were for the jury: Penna. R. Co. v. Werner, 89 Pa. 59. There was no tes-timony showing clearly and conclusively that if the deceased had stopped before entering upon the crossing, he could then either have seen or heard this approaching train. On the con-trary, a calculation based upon the rate at which the train was running, and the assumption that the deceased was traveling two miles per hour, will show that, had he stopped twenty-five feet from the first rail on the side of the crossing where he entered, the train would then have been over 1,000 feet away and entirely out of sight; and, as the wind was blowing in such a direction as to carry the sound away from him, and a locomo-tive was blowing off steam upon his right, the question whether

he could have heard this train coming was for the jury. If he could neither have seen nor heard it, why should he have stopped there?

3. It is claimed that the deceased should have stopped, looked and listened whilst upon the spur tracks, and should either have stood still or retreated, when he saw the train coming. The evidence is that he did stop somewhere on these spur tracks, before coming to the main track upon which the train was approaching, and the law presumes that he looked and listened. There is no evidence that he was familiar with the crossing, and knew that these were spur tracks, or that they were a place of safety. If he lost his presence of mind through the rapid and unexpected approach of the train, negligently driven, and being unable, by reason of the darkness and his want of knowledge of the tracks, to determine on which one it was coming, and whilst thus confused unintentionally ran into instead of out of danger, the company is liable: Whart. on Neg., §§ 93, 304, 377; Penna. R. Co. v. Werner, 89 Pa. 59. Applying the rule to the facts of the case, in the light of Phila. etc. R. Co. v. Hagan, 47 Pa. 244, the court would not have been justified in withdrawing the case from the jury on the question of contributory negligence.

4. There was no error in saying that the rule as to stopping etc. is a rule of evidence only. Where the facts show this was not done, they simply constitute the evidence upon which the court is bound to declare the law. Nor was it error to say that it is usually applied to persons who are driving, and not to persons walking: Penna. R. Co. v. White, 88 Pa. 334. Before the introduction of the testimony referred to in the sixth assignment, the plaintiff had shown by Irwin that the train which struck the deceased was going at the time at about the usual rate of speed, and Thomas Snowden was put upon the stand to fix what was the usual rate of speed of this train. That the question put to him regarding it was general, did the defendant no harm, because the witness answered specially with reference to this train. There is therefore nothing in this assignment requiring correction.

OPINION, MR. JUSTICE MITCHELL:

This is a perfectly clear case of contributory negligence, un-

relieved by any circumstance which the jury should have been allowed to consider as an excuse for a violation of the plainest dictates of prudence, and the settled rules of law. The deceased, at 9 o'clock on a rather dark night in January, was walking along Penn avenue, in the borough of Wilkinsburgh, and came to the railroad, which at that point had then ten or eleven tracks at grade, occupying a space of about one hundred fifty feet. It was intrinsically a dangerous place, and at the particular time was made more than usually so by standing cars and piles of pipe and railroad ties which obstructed the view on one side, and on the other side a train on one of the tracks, with an engine blowing off steam. In the face of these manifest dangers, the deceased and his companion walked straight on, without stopping, until they had crossed six or seven tracks, when they saw an approaching train. At this moment they were either on a spur track that ends a few feet beyond the crossing, or between it and the first passenger track, on which the train was coming. Counting the spur tracks as safe, they had a space of forty-five feet of actual safety in which to wait the passage of the train; but as there is no evidence that they knew that the so-called spur tracks were not ordinary tracks, liable to be used at any time, it is hardly proper to charge them with the knowledge. But from the nearest spur track which they were on, or had just crossed, to the passenger track on which the train was, there was a clear space of twelve feet, in which deceased might have waited in safety, and in which, fortunately for himself, his companion did wait.

From this point I take the narrative in the language of Irwin, the deceased's companion: "When we come to the track, we noticed a train coming. Q. That is, to the main track? A. Yes, sir; and it was pretty close before we seen it; and Mr. Aiken attempted to go on, and I stopped. I said: 'We had better stop;' and he says, 'Come on; we can get across;' and he started, and I stopped. I had attempted to get across, and by the time I was at the track I could lay my hand on the engine." None of these facts were in the slightest doubt, for the evidence was in behalf of the plaintiff, and was that of the only witness who saw the accident. It is therefore indisputable that the deceased saw the train while he was

in a place of safety, and voluntarily took the chances of crossing in front of it. In the face of this patent fact, the other circumstances—the danger of the place, the rate of speed of the train, the absence of warning, the obstructions to sight and hearing, etc.—became totally unimportant, and the plaintiff should have been nonsuited, or a verdict directed against her.

The learned counsel for the defendant in error has endeavored to assimilate this case to Penna. R. Co. v. Werner, 89 Pa. 59; but there is a marked and insuperable line of distinction between them. That was said by our Brother STERRETT, in his opinion, to be a close case; but, in laying down the rule that a man in a position of danger is not responsible for a mistake of judgment in getting out, he was careful to add the explicit qualification that he must have got into the danger without negligence or fault of his own. Keeping this qualification in mind, that case was the logical sequence of Johnson v. Railroad Co., 70 Pa. 357. But in the present case the essential premise is wanting. Aiken not only walked into the dangerous position without any of the precautions which the situation required, but, when confronted with the actual emergency, had his attention called by his companion to the danger imminent, and his reply, " Come on; we can get across,"—does not indicate a man who was confused, and in doubt what to do, but one who saw the risk, and chose to encounter it.

In the portion of the charge contained in the fifth specification of error, the learned judge said to the jury that, " ordinarily, the rule of law is . . . . that a man before crossing a railroad track must stop, look, and listen. . . . . I think that it is usually applied, however, to parties who are driving, and not to parties walking. It is, after all, not a rule of law, but a rule of evidence only; and therefore the duty of stopping is always a question for the jury." This was clear error. The rule as to stopping applies equally to persons walking as to persons driving. There is no distinction, in the nature of things, except of degree as to danger, and none is recognized in the cases: Nagle v. Railroad Co., 88 Pa. 35; Carroll v. Railroad Co., 12 W. N. 348; Penna. R. Co. v. Coon, 111 Pa. 430; Marland v. Railroad Co., 123 Pa. 487. It is made quite as much for the safety and protection of passengers on the train as of passengers on the highway; and the stopping is an essential part of

the rule, to enforce attention to the accompanying duties of looking and listening, and to secure their performance in something more than a perfunctory and heedless way; in fact, to prevent the very thing which cost this unfortunate man his life. Irwin was asked: "Could you hear the train until you got past these obstructions? A. Possibly we might have, if we had been paying particular attention. We were talking, and I didn't notice." It is not a rule of evidence, but a rule of law, peremptory, absolute and unbending; and the jury can never be permitted to ignore it, to evade it, or to pare it away by distinctions and exceptions. That failure to stop is not merely evidence of negligence, but negligence per se, has been said so often, from North Penna. R. Co. v. Heileman, 49 Pa. 60, to Greenwood v. Railroad Co., 124 Pa. 572, that to cite the cases would be wearisome.

The evidence in the sixth assignment, relative to the speed at which trains *usually* ran over this crossing, was irrelevant, and tended to divert the attention of the jury from the particular case to the general condition of danger at this crossing. This objection was not obviated by the testimony of Irwin that he thought the train was going "about the usual rate of speed."

The assignments of error must be sustained.

Judgment reversed.