**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-3369
_____

ROBERT ZIMMERMAN,
Appellant

v.

NORFOLK SOUTHERN CORPORATION
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
District Court No. 05-10-cv-02267
District Judge: The Honorable James Knoll Gardner

Argued September 10, 2012

Before: SMITH, CHAGARES, and ALDISERT, *Circuit Judges*

(Filed:  January 23, 2013 )

Joshua M. Autry
Dennis E. Boyle [ARGUED]
Boyle, Autry & Murphy

4660 Trindle Road
Suite 200
Camp Hill, PA 17001

Emily M. Bell
Jeffrey A. Conrad
Clymer, Musser, Brown & Conrad
408 West Chestnut Street
Lancaster, PA 17603
        *Counsel for Appellant*

Richard K. Hohn [ARGUED]
Robert M. Stroh
Hohn & Scheuerle
1700 Market Street
Suite 3242
Philadelphia, PA 19103
        *Counsel for Appellee*

———————————

OPINION

———————————

SMITH, *Circuit Judge.*

Robert Zimmerman was riding his motorcycle on a summer evening in 2008. He approached a railroad crossing, but it was dark and a building obscured the tracks. When he

2

was less than seventy-six feet away, he noticed that a train was approaching. He tried to stop, but his front brake locked and he flew over the handlebars, colliding headfirst with a locomotive. The collision left him partially paralyzed. He sued Norfolk Southern Corporation in federal court, asserting three state tort claims.[1]

Railroads are among the most heavily regulated American industries. Unfortunately for Zimmerman, many of these regulations preempt state tort claims. The Federal Railroad Safety Act ("FRSA") contains a provision that outlines the scope of preemption. 49 U.S.C. § 20106. The District Court for the Eastern District of Pennsylvania relied on this provision in granting summary judgment for Norfolk Southern, concluding that most of Zimmerman's claims were preempted. We will reverse in part and affirm in part.

I

Diller Avenue is a two-lane road that runs diagonally through New Holland, Pennsylvania. In the southern part of town, Diller Avenue intersects a railroad track owned and

---

[1] The proper party to this action appears to be Norfolk Southern Railway Company, a subsidiary of Norfolk Southern Corporation, but neither party has moved to amend the caption. *See Zimmerman v. Norfolk S. Corp.*, No. 10-cv-02267, 2011 WL 3625039, at *1 n.1 (E.D. Pa. Aug. 17, 2011). We refer throughout to the appellee as Norfolk Southern.

3

operated by Norfolk Southern. Because of the location of a tavern northwest of the crossing, southbound motorists have a difficult time seeing eastbound trains. For example, a motorist who is seventy-six feet away can see only sixty-five feet down the tracks. The speed limit on Diller Avenue is thirty-five miles per hour, while the speed limit on the tracks is subject to some disagreement. Norfolk Southern argues that the limit is at least twenty-five and maybe forty miles per hour, but Zimmerman argues that it is ten miles per hour.

The Diller Avenue crossing has been the scene of a number of accidents over the years. Five accidents were reported at the crossing in the 1970s. A decade later, the Commonwealth of Pennsylvania and the crossing's former owner installed two white railroad-crossing signs, called crossbucks, with the use of federal funds. Since the installation of these signs, five more accidents have been reported. At the time of Zimmerman's accident, there was a crossbuck fixed on each side of the track; there was also a yellow warning sign on Diller Avenue, 150 feet north of the crossing, together with painted warnings on the street. Zimmerman contends that these warnings had fallen into disrepair—tree branches covered the signs on the north side and the street markings had faded.

On June 12, 2008, Zimmerman celebrated his thirty-eighth birthday. After a game of church softball and a trip to his mother's house, he headed for home on his motorcycle. It was dark, and Zimmerman was wearing a helmet and riding within the speed limit. He turned south onto Diller Avenue

and approached the crossing—a crossing he did not believe was still active. Meanwhile, an eastbound Norfolk Southern train consisting of only two engines approached the crossing travelling twenty-four miles per hour. It sounded its horn.

Zimmerman apparently failed to notice that the train was about to enter the crossing until he was less than seventy-six feet away.[2] At that point, he was too close to the track to stop.[3] One of the train operators noticed Zimmerman around this time but could not stop the train soon enough to avoid the collision. Zimmerman aggressively applied the brake of his motorcycle, causing the front wheel to lock. He flipped over the handlebar and flew headfirst into the gas tank of the lead engine. The collision left him partially paralyzed.

Zimmerman sued Norfolk Southern in the Eastern District of Pennsylvania under Pennsylvania tort law. His complaint listed four counts: failure to warn; failure to maintain a safe crossing; failure to ensure that the crossing devices complied with federal regulations; and punitive damages. On August 17, 2011, the District Court granted

---

[2] Zimmerman has only a vague recollection of the events, so the experts have attempted to recreate the crash. One of Zimmerman's experts concluded that "[w]hen Zimmerman was 76 to 97 feet away from the point of collision, the train was not visible." J.A. 687.

[3] According to Zimmerman's expert, a vehicle travelling thirty-five miles per hour needs at least seventy-six feet to stop.

5

Norfolk Southern's motion for summary judgment, concluding that some of Zimmerman's claims were preempted and that others did not create a genuine issue of material fact.

Zimmerman filed a timely notice of appeal.[4] We exercise plenary review over the District Court's decision to grant a motion for summary judgment. *Orvosh v. Program of Grp. Ins. for Salaried Emps. of Volkswagen of Am.*, 222 F.3d 123, 129 (3d Cir. 2000). We construe the evidence in the light most favorable to Zimmerman, *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986), and we affirm "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). A "genuine dispute" exists if a reasonable jury could find for the nonmoving party. *Fakete v. Aetna, Inc.*, 308 F.3d 335, 337 (3d Cir. 2002).

II

The doctrine of preemption permeates Zimmerman's appeal. Norfolk Southern argues that various federal regulations preempt Zimmerman's claims under the FRSA preemption provision. 49 U.S.C. § 20106. We have interpreted the provision a few times over the years, but Congress changed it in 2007. We begin our discussion by

---

[4] The District Court had jurisdiction under 28 U.S.C. § 1332, and we have jurisdiction under 28 U.S.C. § 1291.

providing a framework for analyzing preemption under the amended FRSA. We do so because we have yet to interpret the amendment and because this analysis is relevant to each of Zimmerman's claims. We then turn to those claims.

The Supremacy Clause of the United States Constitution is the source of preemption. U.S. Const. art. VI, cl. 2. Under the Supremacy Clause, federal law trumps or preempts state law whenever the two are in conflict. Preemption can be express or implied—either way, the effect is the same: preemption renders the relevant state law invalid. *See Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992); *Holk v. Snapple Beverage Corp.*, 575 F.3d 329, 334 (3d Cir. 2009) (recognizing that implied preemption comes in two varieties: field preemption and conflict preemption). We tend to interpret federal statutes in a way that avoids implied preemption. *Holk*, 575 F.3d at 334 (citing *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005)). The same is not true of express preemption.

Here, the FRSA expressly preempts state railroad law. Subsection (a) outlines the scope of FRSA preemption: "Laws, regulations, and orders related to railroad safety . . . shall be nationally uniform to the extent practicable." 49 U.S.C. § 20106(a)(1). Yet the FRSA does not preempt all state railroad law: "A State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation . . . prescribes a regulation or issues an order covering the subject matter of the State requirement." *Id.* § 20106(a)(2). Moreover, states

7

may adopt a "more stringent law" if it is necessary to eliminate a "local safety or security hazard." *Id.* § 20106(a)(2)(A). As the Supreme Court has noted, the FRSA "displays considerable solicitude for state law." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 665 (1993); *see also Norfolk S. Ry. Co. v. Shanklin*, 529 U.S. 344, 352–54 (2000).

Before the 2007 amendment, we held that a federal regulation preempts state law under subsection (a) if the regulation "substantially subsume[s] the subject matter of the relevant state law." *Strozyk v. Norfolk S. Corp.*, 358 F.3d 268, 271 (3d Cir. 2004) (quoting *Easterwood*, 507 U.S. at 664) (quotation marks omitted). The regulation must do more than simply "touch upon or relate to [the] subject matter" of the state law. *Id.* at 273 (quoting *Easterwood*, 507 U.S. at 664) (internal quotation marks omitted).

Congress amended the FRSA preemption provision in 2007 by adding subsection (b), which is a "[c]larification regarding State law causes of action":

> (1) Nothing in this section shall be construed to preempt an action under State law seeking damages for personal injury, death, or property damage alleging that a party—
>
>> (A) has failed to comply with the Federal standard of care established by a regulation or order issued by the Secretary of Transportation . . . or the Secretary of Homeland Security . . . , covering the

8

subject matter as provided in subsection (a) of this section;

(B) has failed to comply with its own plan, rule, or standard that it created pursuant to a regulation or order issued by either of the Secretaries; or

(C) has failed to comply with a State law, regulation, or order that is not incompatible with subsection (a)(2).

49 U.S.C. § 20106(b)(1).

The question before us is how to interpret the FRSA preemption provision in light of the 2007 amendment. Zimmerman argues that the amendment restricts the scope of preemption and thus supersedes all prior cases interpreting subsection (a), including our decision in *Strozyk* and the Supreme Court's decisions in *Shanklin* and *Easterwood*. Norfolk Southern agrees that the amendment restricts preemption in some respects but argues that it preserves cases interpreting the phrase "covering the subject matter of the State requirement." *Id.* § 20106(a)(2). We agree with Norfolk Southern's interpretation.

Statutory interpretation requires that we begin with a careful reading of the text. *See Bruesewitz v. Wyeth Inc.*, 561 F.3d 233, 244 (3d Cir. 2009) (noting that this Court "decline[s] to employ legislative history if a statute is clear on its face"); *Hay Grp., Inc. v. E.B.S. Acquisition Corp.*, 360

F.3d 404, 406 (3d Cir. 2004). The scope of the amendment is clear from the text: it clarifies that claimants can avoid preemption by alleging a violation of either a "Federal standard of care" or the railroad's "own plan, rule, or standard that it created pursuant to a regulation or order." 49 U.S.C. § 20106(b)(1)(A)–(B). The amendment otherwise preserves the analysis for deciding whether a regulation preempts state law.

For starters, the amendment did not change the language of subsection (a). Federal regulations still preempt state law if they "cover[] the subject matter." *Id.* § 20106(a)(2). The continued use of this language indicates that the analysis remains the same. In fact, the amendment explicitly preserves the right to seek damages for violating state law, as long as the law is compatible with subsection (a)(2). *See id.* § 20106(b)(1)(C). Moreover, the title of the new subsection (b) is "Clarification regarding State law causes of action." The word "clarification" suggests that the amendment attempted to resolve an ambiguity rather than change substantive law. *See Henning v. Union Pac. R.R. Co.*, 530 F.3d 1206, 1216 (10th Cir. 2008) ("[T]he [title] . . . indicates Congress sought to resolve an ambiguity rather than effect a substantive change."). The amendment thus preserves cases such as *Strozyk* and *Shanklin* that analyzed whether a regulation covers state law. The amendment is significant for a different reason: it clarifies that even when a regulation covers the subject matter of a claim, the claim can avoid preemption if the railroad violated a federal standard of care

10

or its internal rule. *See* 49 U.S.C. § 20106(b)(1)(A)–(B).[5]

---

[5] Although the amendment's plain text resolves the question before us, its history is entirely consistent with our analysis. In 2002, a train carrying anhydrous ammonia derailed in Minot, North Dakota. Toxins filled the air, forcing many local residents to evacuate. The toxins killed one person and injured at least a hundred others. Two federal district courts considered tort claims arising from the derailment. *Lundeen v. Canadian Pac. Ry. Co.*, 507 F. Supp. 2d 1006, 1009 (D. Minn. 2007); *Mehl v. Canadian Pac. Ry., Ltd.*, 417 F. Supp. 2d 1104, 1106 (D.N.D. 2006). In both cases, the courts interpreted the FRSA and concluded that the plaintiffs' tort claims were preempted, even though the plaintiffs alleged that the railroad violated federal regulations and its own internal rules. *See Mehl*, 417 F. Supp. 2d at 1116–17 (holding that the plaintiffs' claims were preempted despite allegations that the railroad violated federal regulations); *Lundeen*, 507 F. Supp. 2d at 1011–12 (holding that the plaintiffs' claims were preempted despite allegations that the railroad violated its internal rules).

Congress renounced these interpretations by passing the 2007 amendment. A conference report stated that the goal was "to rectify the Federal court decisions related to the Minot, North Dakota accident that are in conflict with precedent." H.R. Rep. No. 110-259, at 351 (2007), *reprinted in* 2007 U.S.C.C.A.N. 119, 119. The report also states that the "restructuring is not intended to indicate any substantive change in the meaning of the provision." *Id.*

11

We therefore conclude that the preemption analysis under the amended FRSA requires a two-step process. We first ask whether the defendant allegedly violated either a federal standard of care or an internal rule that was created pursuant to a federal regulation. If so, the plaintiff's claim avoids preemption. *See* 49 U.S.C. § 20106(b)(1)(A)–(B). Otherwise, we move to the second step and ask whether any federal regulation covers the plaintiff's claim. *See id.* § 20106(a)(2). A regulation covers—and thus preempts—the plaintiff's claim if it "substantially subsume[s] the subject matter" of that claim. *Easterwood*, 507 U.S. at 664 (noting that the regulation must do more than "touch upon or relate to [the] subject matter"). In this step, we rely on precedent— including cases that predate the 2007 amendment. This two-step approach is consistent with the text of the amended FRSA and its history, and is similar to approaches in the Eighth and Tenth Circuits. *Grade v. BNSF Ry. Co.*, 676 F.3d 680, 686 (8th Cir. 2012); *Henning*, 530 F.3d at 1216.

## III

We address each of Zimmerman's claims in turn.

## A

Zimmerman's first claim is that Norfolk Southern negligently failed to warn him of the approaching train. In Zimmerman's complaint, this claim has at least three parts: (1) the train failed to obey the speed limit; (2) the train failed to use its light and horn; and (3) Norfolk Southern failed to provide motorists with an adequate view of the track. But

12

Zimmerman conceded during oral argument that he lacks evidence that the train failed to use its light and horn, and the duty to provide adequate sight distance is a separate duty, as discussed in Part III.B. Zimmerman's first claim thus boils down to a single claim: excessive speed.

> *1. Zimmerman's excessive-speed claim is not preempted because 49 C.F.R. § 213.9 creates a federal standard of care.*

Railroads have a duty under Pennsylvania law to warn motorists of approaching trains. *Wilson v. Pa. R.R. Co.*, 219 A.2d 666, 668–69 (Pa. 1966). This duty requires railroads to avoid excessive speeds, since motorists are less likely to see speeding trains, and sight is an important warning method. *See id.* (explaining the relationship between a train's speed and its warning and noting that speeding trains have less time to stop); *see also Conner v. Pa. R.R. Co.*, 263 F.2d 944, 945–46 (3d Cir. 1959).

Norfolk Southern allegedly violated this duty by operating its train at more than double the speed limit. A federal regulation establishes the speed limit for each class of tracks: ten miles per hour for freight trains on Class 1 tracks, twenty-five miles per hour on Class 2 tracks, forty miles per hour on Class 3 tracks, and so on. 49 C.F.R. § 213.9. Both sides agree that the train was travelling no more than twenty-five miles per hour when it entered the crossing. Zimmerman alleges that the track at the crossing was Class 1, which would mean the train was travelling in excess of the speed limit. Norfolk Southern responds that the track was Class 2 or

13

3, which would mean the train was travelling within the limit.

The initial question is whether 49 C.F.R. § 213.9 preempts Zimmerman's excessive-speed claim. We note at the outset that no other federal court of appeals has considered whether such claims are preempted under the amended FRSA provision. Before the 2007 amendment, the Supreme Court held that speeding claims are preempted when a train is travelling *below* the federally mandated speed limit. *Easterwood*, 507 U.S. at 673–75 (concluding that the plaintiff's claim was preempted when the train was travelling, at most, fifty miles per hour on tracks with a limit of sixty miles per hour); *see also Waymire v. Norfolk & W. Ry. Co.*, 218 F.3d 773, 776 (7th Cir. 2000) (relying on *Easterwood* to conclude that an excessive-speed claim was preempted under the FRSA when the train was travelling below the speed limit). But *Easterwood* is inapposite here because Zimmerman alleges that the train he collided with was travelling *above* the speed limit.

Zimmerman's excessive-speed claim avoids preemption if § 213.9 creates a federal standard of care. A regulation creates a standard of care for FRSA preemption purposes if it establishes the degree of care that the defendant—in most cases, the railroad—must exercise. *See Black's Law Dictionary* 1441 (8th ed. 2004) (defining "standard of care" as "the degree of care that a reasonable person should exercise"); *see also Henning*, 530 F.3d at 1216 (concluding there is no federal standard of care if the regulation takes the "final authority to decide" what action is

14

needed "out of the railroad's [hands]" (internal quotations marks and citations omitted)); *Grade*, 676 F.3d at 686 (same).

The Minot derailment cases provide a good example of regulations that create a federal standard of care. Indeed, at least some members of Congress had these cases in mind when amending the FRSA. *See* H.R. Rep. No. 110-259, at 351 (2007), *reprinted in* 2007 U.S.C.C.A.N. 119, 119 (noting that the goal of the FRSA amendment was "to rectify the Federal court decisions related to the Minot, North Dakota accident that are in conflict with precedent"). The plaintiffs in *Mehl v. Canadian Pacific Railway* alleged that the railroad had violated a number of regulations, including 49 C.F.R. §§ 215.11 and 215.13, which require railroads to inspect tracks and freight cars. *See* 417 F. Supp. 2d 1104, 1115 & n.5 (D.N.D. 2006). In prescribing how these inspections should be carried out, the regulations create a federal standard of care because they establish the degree of care that railroads must exercise. By contrast, a regulation does not establish a federal standard of care if the state is responsible for compliance. *See Grade*, 676 F.3d at 686 (concluding that various regulations did not create a federal standard of care because they "place the responsibility for implementing adequate warning devices on the State, thereby preempting any cause of action alleging a railroad failed to properly install an adequate warning device"). After all, if the state is responsible, railroads cannot, "as a matter of law, fail to comply" with the regulation. *Id.* (citation and internal quotation marks omitted).

We conclude that the speed limits in § 213.9 create a

15

federal standard of care. Section 213.9 establishes the degree of care that railroads must exercise on each class of tracks: trains should not exceed ten miles per hour on Class 1 tracks, twenty-five miles per hour on Class 2 tracks, and so on. Like the regulations in *Mehl* and unlike the regulations in *Grade*, railroads are ultimately responsible for compliance—they must ensure that their trains are travelling within the limit. As a result, Zimmerman's speeding claim is not preempted. Because his claim avoids preemption in the first step of the FRSA preemption analysis, we need not consider the second step.

### 2. *The District Court improperly excluded eight crossing reports.*

Zimmerman's excessive-speed claim has cleared the preemption hurdle, but it must also clear an evidentiary hurdle. Zimmerman acknowledges that the train was travelling within the speed limit for Class 2 and Class 3 tracks. He alleges, however, that the track was Class 1. There is some evidence to support this allegation.

The record contains two types of documents that help Zimmerman: crossing reports from the Department of Transportation's National Crossing Inventory and accident reports from a similar database. The crossing reports state that the speed limit is ten or fifteen miles per hour, and at least some of the accident reports suggest that the track is Class 1. The District Court nevertheless excluded these documents based on two evidentiary privileges: 23 U.S.C. § 409 and 49 U.S.C. § 20903. Zimmerman argues that the District Court

16

misconstrued these privileges. We consider the crossing reports here and the accident reports in the next section.

The National Crossing Inventory is a database of highway-railroad crossings in the United States. The inventory contains reports on each crossing, which include information such as the number of trains that pass through daily, the typical train speed, and the maximum speed. Zimmerman accessed the database and obtained nine reports on the Diller Avenue crossing—the oldest from 1970 and the most recent from 2010. The nine reports were submitted to the national inventory by different entities: four by the Commonwealth of Pennsylvania, two by Norfolk Southern, and two by Conrail, the prior owner of the crossing. It is unclear who submitted the initial report. The reports state that the typical train speed over the crossing is five to ten miles per hour and that the "Maximum Time Table Speed" is ten or fifteen miles per hour.[6]

According to these crossing reports, Norfolk Southern's train was travelling too fast at the time of the collision. Nevertheless, the District Court excluded them based on the privilege created by 23 U.S.C. § 409:

Notwithstanding any other provision of law,

---

[6] Eight crossing reports state that the "Maximum Time Table Speed" is "10"—presumably meaning miles per hour. J.A. 995–1012. The ninth report states that the maximum speed is "15." *Id.* at 1008–09.

17

reports, surveys, schedules, lists, or data compiled or collected for the purpose of identifying, evaluating, or planning the safety enhancement of potential accident sites, hazardous roadway conditions, or railway-highway crossings, pursuant to sections 130, 144, and 148 of this title or for the purpose of developing any highway safety construction improvement project which may be implemented utilizing Federal-aid highway funds shall not be subject to discovery or admitted into evidence in a Federal or State court proceeding or considered for other purposes in any action for damages arising from any occurrence at a location mentioned or addressed in such reports, surveys, schedules, lists, or data.

Though pleonastically expressed, this statutory privilege clearly has two parts. The first part excludes reports, data, and the like if they were compiled or collected to identify, evaluate, or plan "the safety enhancement of potential accident sites, hazardous roadway conditions, or railway-highway crossings, pursuant to sections 130, 144, and 148 of [Title 23]." The second part excludes such documents if they were compiled or collected to develop "any highway safety construction improvement project which may be implemented utilizing Federal-aid highway funds." The District Court concluded that the crossing reports were privileged under the first part of § 409.

18

Like all evidentiary privileges, we interpret this privilege narrowly. *Pierce Cnty. v. Guillen*, 537 U.S. 129, 144 (2003) (concluding that courts should interpret § 409 narrowly because it "impede[s] the search for the truth"). Moreover, the party invoking an evidentiary privilege has the burden of proof. *See In re Grand Jury Investigation,* 918 F.2d 374, 385 n.15 (3d Cir. 1990) ("[A] party who asserts a privilege has the burden of proving its existence and applicability.").

We begin with the first part of the § 409 privilege. Both sides agree that the reports from the National Crossing Inventory were collected to evaluate railway-highway crossings. They disagree, however, that the reports were collected "pursuant to sections 130, 144, and 148 of [Title 23]." Zimmerman asserts that collection of the reports was not pursuant to any section, while Norfolk Southern asserts that they were collected pursuant to § 130.

Congress passed the Federal-Aid Highway Act in 1973. Pub. L. No. 93-87, 87 Stat. 250 (1973). The Act created the Federal Railroad Administration and imposed various safety-related obligations on states that accept federal funds. Some of these obligations are now codified in 23 U.S.C. § 130. In particular, subsection (d) requires states to maintain an inventory of railroad crossings within their borders:

> Each State shall conduct and systematically maintain a survey of all highways to identify those railroad crossings which may require separation, relocation, or protective devices, and

19

establish and implement a schedule of projects for this purpose. At a minimum, such a schedule shall provide signs for all railway-highway crossings.

23 U.S.C. § 130(d). When it was first passed, the Act did not require any federal agency to maintain a national crossing inventory.

Despite the absence of a statutory requirement, various federal agencies, state highway departments, and private railroad associations "formed a voluntary cooperative effort" to create the National Crossing Inventory. Federal Railroad Administration, *U.S. DOT National Highway-Rail Crossing Inventory: Policy, Procedures and Instructions for States and Railroads* 3 (2007), http://www.fra.dot.gov/downloads/safety/RXIPolicyInstructions0807.pdf ["*2007 Manual*"]. Railroads and the Department of Transportation agreed to share the costs, and the Federal Railroad Administration became responsible for maintaining the national inventory. *See* Federal Railroad Administration, *Highway-Rail Crossing Inventory Instructions and Procedures Manual* 1-3 to 1-4 (1996), http://www.fra.dot.gov/rrs/pages/fp_1499.shtml ["*1996 Manual*"].

Over the next few decades, states and railroads voluntarily submitted information to the inventory. The submission process changed over time—states and railroads sometimes submitted information independently, and railroads sometimes submitted information to states, which

20

then passed it along to the national inventory. *Compare id.* at 4-1 ("[T]he State transportation agency should be the party who forwards all data item changes for any and all crossings to the [Federal Railroad Administration]." (emphasis omitted)), *with 2007 Manual* at 44–45 (indicating that railroads should send some information directly to the Federal Railroad Administration). Many states willingly submitted information to the national inventory because they were able to meet their duty to create a statewide inventory under § 130(d) by participating in the national inventory. *See 1996 Manual* at 1-1.

The cooperative effort notwithstanding, gaps remained in the National Crossing Inventory thirty years later. *See* Letter from Norman Y. Mineta, U.S. Sec'y of Transp., to J. Dennis Hastert, Speaker of the U.S. House of Representatives (July 11, 2003), http://testimony.ost.dot.gov/final/rail04.pdf. The Department of Transportation urged Congress to pass legislation that would force states and railroads to fill the gaps. *Id.* Congress eventually responded by passing the Rail Safety Improvement Act of 2008, Pub. L. No. 110-432, 122 Stat. 4848. This Act requires states and railroads to independently submit information to the Secretary of Transportation on a regular basis. Significantly, the Act codified the submission requirements in separate places: the state-reporting requirement in 23 U.S.C. § 130(l) and the railroad-reporting requirement in 49 U.S.C. § 20160.

As noted above, the record in this case contains two reports submitted to the National Crossing Inventory after the

21

passage of the Rail Safety Improvement Act in 2008. Both were submitted in 2010, one by the Commonwealth of Pennsylvania, the other by Norfolk Southern. J.A. 995–98. The question, again, is whether they were collected or compiled pursuant to § 130.

We conclude that after the 2008 Act, state-submitted reports are collected pursuant to § 130, but railroad-submitted reports are not. As a result, only state reports are privileged under the first part of § 409. Our conclusion is textually based: states must submit crossing reports to the national inventory under 23 U.S.C. § 130(l) (which § 409 references), while railroads must submit under 49 U.S.C. § 20160 (which § 409 does not reference). State reports are thus collected "pursuant to section[] 130," and railroad reports are not. Congress could have placed the railroad-reporting requirement in § 130 alongside the state requirement—in that case, railroad reports would be similarly privileged. But Congress instead chose to place the requirement in a different title of the United States Code. We regard that drafting choice as meaningful. Congress may well have had a stronger interest in protecting states, rather than railroads, from litigation. *See Guillen*, 537 U.S. at 147 (indicating that the primary goal of § 409 is to protect "state and local governments"). Whatever the reason, the text is plain. Accordingly, the 2010 Pennsylvania report is privileged under the first part of § 409 and the 2010 Norfolk Southern report is not.

The record also contains seven reports submitted prior

22

to the passage of the Rail Safety Improvement Act of 2008—some submitted by the Commonwealth of Pennsylvania, others by various railroads including Norfolk Southern. At first blush, the analysis is straightforward. Neither 23 U.S.C. § 130(l) nor 49 U.S.C. § 20160 existed before 2008. States and railroads voluntarily participated in the National Crossing Inventory, so they did not submit reports pursuant to § 130 or any other statute. Even so, a few factors complicate the analysis.

The first complication is that § 130(d) has long required states to maintain statewide inventories of railroad crossings. State inventories are thus "compiled . . . pursuant to section[] 130" and so are privileged under § 409. To be sure, the pre-2008 reports in this case are from the national inventory. But states presumably rely on their own inventories when submitting reports to the national inventory. It is therefore possible that the pre-2008 Pennsylvania reports from the national inventory either were originally collected pursuant to § 130 or rely on data originally collected pursuant to § 130.[7]

---

[7] Another complication is that some states meet their duty to create a state inventory by participating in the national inventory. *See 1996 Manual* at 1-1. This means that for some states, the privileged state inventories are their submissions to the national inventory. In that case, the reports from the national inventory might be privileged. We need not take on this issue because Pennsylvania has its own crossing

23

The second complication is that before the 2008 Act, railroads often submitted crossing reports directly to the states. The states used the railroad reports to create their inventories and then passed them along to the national inventory. *See 1996 Manual* at 4-1. Such railroad reports were thus "collected" by the states "pursuant to section[] 130." Again, the pre-2008 railroad reports in this case are from the national inventory, but it is possible that the Commonwealth originally collected these reports to create its own inventory pursuant to § 130(d).

These complications raise the following question: Do reports originally collected pursuant to § 130(d)—and therefore privileged under § 409—lose the privilege when voluntarily submitted by a state to the federal government? Zimmerman contends that the answer is found in *Guillen*. There, the county sheriff prepared an accident report after a deadly car crash. 537 U.S. at 136–40. The county public works department later acquired the report and used it to apply for funding under 23 U.S.C. § 152, which was one of the statutes listed in § 409 at the time. The Court concluded that the report was privileged in the hands of the public works department because the department collected it pursuant to § 152. *Id.* at 144–46. The Court nevertheless concluded that the same report was not privileged in the hands of the sheriff because he did not collect it pursuant to any statute listed in

inventory. *See* Pennsylvania Department of Transportation, *Grade Crossing Electronic Document Management System* (2012), https://www.dot14.state.pa.us/gcedmsweb/home.jsp.

§ 409. *Id.*

*Guillen* indicates that the question is whether the immediate source of the documents—here, the Federal Railroad Administration—"collected" them "pursuant to sections 130, 144, and 148 of [Title 23]." 23 U.S.C. § 409. But there is one important difference between the case before us and *Guillen*. The pre-2008 reports in our case might have been originally collected pursuant to § 130(d), whereas the report in *Guillen* was not originally collected pursuant to any statute listed in § 409. *See* 537 U.S. at 144–46. The Eighth Circuit has suggested that this difference is meaningful. *See Robertson v. Union Pac. R.R. Co.*, 954 F.2d 1433, 1435 (8th Cir. 1992) (excluding a newspaper article that relied on privileged data to prevent "circumvent[ing] the purpose of the statute").

We need not decide this difficult question. Norfolk Southern bears the burden of proving that the privilege applies. *See In re Grand Jury Investigation,* 918 F.2d at 385 n.15. And it has failed to show that the seven national reports from before 2008 were ever "collected . . . pursuant to section[] 130." As we have pointed out, it is certainly possible that the reports either were originally collected pursuant to § 130(d) or relied on data collected pursuant to § 130(d). But Norfolk Southern has offered no evidence that they were, and we construe the available evidence in the light most favorable to Zimmerman. As a result, we conclude that the District Court improperly excluded the seven pre-2008 crossing reports at the summary-judgment stage.

25

Although eight crossing reports are not covered by the first part of the privilege, they will still be inadmissible if they fall within the second part—that is, if they were "compiled or collected . . . for the purpose of developing any highway safety construction improvement project which may be implemented utilizing Federal-aid highway funds." 23 U.S.C. § 409. We turn to this second part.

There are two plausible interpretations of the relevant language in § 409. The broad interpretation is that a report was "collected . . . for the purpose of developing any highway safety construction improvement project" if the agency collected the report with the understanding that someone might use it to improve highway safety in a later construction project.[8] The narrow interpretation is that a report was collected for the statutory purpose if the agency collected it with the intent to use it for a particular construction project. In short, the broad interpretation would privilege any document that was collected to improve highway safety— such as reports in a database—while the narrow interpretation would privilege only those documents that were collected for a particular project.

We follow the Supreme Court's example and adopt the narrow interpretation. *See Guillen*, 537 U.S. at 144–45

---

[8] Despite the surfeit of modifiers, we interpret the phrase "highway safety construction improvement project" to mean simply a construction project that improves highway safety.

26

(noting two plausible interpretations of a separate clause in § 409 and adopting the "narrower view"). First, "statutes establishing evidentiary privileges must be construed narrowly because privileges impede the search for the truth." *Id.*; *see also In re Grand Jury Investigation*, 918 F.2d at 386 (recognizing "the general constructional rule that evidentiary privileges should be narrowly construed").

Furthermore, the narrow interpretation is more faithful to the text. The broad interpretation renders much of § 409 redundant: if the second part privileges any document that might be used to improve highway safety in a later construction project, there would be no need for the first part to privilege documents "compiled or collected for the purpose of identifying, evaluating, or planning the safety enhancement of potential accident sites, hazardous roadway conditions, or railway-highway crossings." After all, these specific purposes all deal with information that might be used to improve safety in a later project. So every document that is privileged under the first part would also be privileged under the second part. We eschew the broad interpretation to avoid redundancy. *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 574 (1995) ("[T]he Court will avoid a reading which renders some words altogether redundant."); *Ki Se Lee v. Ashcroft*, 368 F.3d 218, 223 (3d Cir. 2004) (recognizing "the goal of avoiding surplusage in construing a statute").

And the privilege uses different verbs in the first and second parts—"identifying, evaluating, or planning" in the first and "developing" in the second. The first part seems to

27

privilege documents that deal with both potential and actual projects, while the second part appears to privilege only those documents that deal with actual projects. Or to put it another way, the second part privileges documents prepared when the agency already has a construction project in mind—and not simply documents that might be used to plan later projects.

We conclude that the second part of § 409 excludes only those documents that were collected for a particular highway-safety construction project. Here, there is no indication that the Diller Avenue reports were collected for a particular project—instead, they were collected to establish a national database that might be used in future projects. The second part of § 409 does not apply.

In sum, Zimmerman has nine crossing reports that suggest the Norfolk Southern train was going too fast when it entered the Diller Avenue crossing. The District Court excluded all nine reports under § 409. It should, however, have excluded only the 2010 Pennsylvania report. We now consider Zimmerman's other evidence of excessive speed.

### 3. *The District Court improperly excluded nine accident reports.*

Zimmerman obtained ten Department of Transportation accident reports. The reports cover accidents that occurred at the Diller Avenue crossing over the past few decades, from a minor collision in 1975 to Zimmerman's crash in 2008. The reports describe the conditions of the accident—weather, number of injuries, time of day, and so

28

on. And they list the classification of the track at the crossing: four reports state that the track was Class 2, one that it was Class 3, and five—all from the 1970s—that it was Class 1. The ten reports provide at least mixed evidence that the crossing was Class 1 and thus that the Norfolk Southern train was speeding. Even so, the District Court excluded the reports based on another evidentiary privilege: that contained in 49 U.S.C. § 20903.[9] This statute states in part:

> No part of an accident or incident report filed by a railroad carrier under section 20901 of [Title 49] . . . may be used in a civil action for damages resulting from a matter mentioned in the report.

The parties agree that the accident reports were "filed by a railroad carrier" under 49 U.S.C. § 20901. But Zimmerman argues that the privilege excludes only the report of his accident, not the nine other reports. His argument is textual: the privilege does not exclude accident reports from all civil cases. It merely excludes reports from civil cases that result "from a matter mentioned in the report." In Zimmerman's view, his "civil action for damages" arose from the accident mentioned in his report, but it did not arise from the accidents mentioned in the remaining nine reports. We agree that these reports fall outside the privilege.

---

[9] The District Court also relied on 49 C.F.R. § 225.7(b), but this regulation merely repeats the § 20903 statutory privilege.

29

Norfolk Southern urges us to broadly interpret the term "matter." In Norfolk Southern's view, "matter mentioned in the report" does not simply mean "the *accident* mentioned in the report," as Zimmerman implicitly argues. It also means "the *location* mentioned in the report." The privilege therefore excludes all ten reports, since Zimmerman's lawsuit is "a civil action for damages resulting from a matter"—or location, the Diller Avenue crossing—"mentioned in the report[s]." This argument is unpersuasive because Norfolk Southern takes the word "matter" completely out of context. The phrase "damages resulting from" appears directly before the word "matter," indicating that a "matter" is the event that caused the harm discussed in the report. *See Lee v. Nat'l R.R. Passenger Corp. (Amtrak)*, No. 3:10-cv-00392, 2012 WL 130267, at *2 (S.D. Miss. Jan. 17, 2012) (holding that § 20903 does not apply to prior accident reports at the same crossing). We conclude that § 20903 excludes the report of Zimmerman's accident but not the nine other reports.

Norfolk Southern also argues that the § 409 privilege excludes the accident reports. Again, the privilege has two parts. The first part excludes reports collected to identify, evaluate, or plan "the safety enhancement of potential accident sites, hazardous roadway conditions, or railway-highway crossings, pursuant to sections 130, 144, and 148 of [Title 23]." This part plainly does not apply because the accident reports were collected pursuant to 49 U.S.C. § 20901—not pursuant to any section of Title 23.

The second part of § 409 excludes reports if they were

30

collected to develop "any highway safety construction improvement project which may be implemented utilizing Federal-aid highway funds." As we concluded above, the language excludes only those documents that were collected for a particular highway-safety construction project. Like the reports in the National Crossing Inventory, accident reports are collected for a variety of reasons. One reason is to provide data for future safety projects. In most cases, however, accident reports are not collected for a particular highway-safety construction project. Nor does Norfolk Southern point to any evidence that the Diller Avenue accident reports were collected for a particular project. Therefore, nine of the ten accident reports are admissible.

Based on the foregoing, we conclude that most of the crossing reports and accident reports are admissible. These reports suggest that the speed limit at the crossing was ten miles per hour or, equivalently, that the track was Class 1. That said, Zimmerman's claim is far from a slam-dunk. Other evidence suggests that the track was Class 2 or Class 3. Norfolk Southern claims that it reclassified the track but failed to update the crossing reports. This claim is consistent with the accident reports—the most recent reports list the track as Class 2 or Class 3. But acceptance or rejection of Norfolk Southern's explanation is the province of a jury. For now, the conflicting evidence results in Zimmerman's excessive-speed claim surviving summary judgment.

*4. Zimmerman's alternative claim of track misclassification is preempted.*

Zimmerman advances an alternative argument. If the track was in fact classified as Class 2 or Class 3, Zimmerman claims that Norfolk Southern should be liable for misclassification. According to Zimmerman, the limited sight distance imposed a duty on Norfolk Southern to classify the track as Class 2 or higher.

The first question—and, as it turns out, the only question—is whether Zimmerman's alternative claim avoids preemption. Zimmerman argues that Norfolk Southern violated a federal standard of care. *See* 49 U.S.C. § 20106(b)(1)(A). He points to 49 C.F.R. pt. 213, which contains regulations for each class of tracks. But none of the regulations discuss track visibility. Zimmerman curiously cites two regulations that have nothing to do with visibility. *See* 49 C.F.R. §§ 234.203 (setting standards for control circuits), 234.225 (regulating the activation of warning systems). He also points to a regulation in Title 23 that mentions the term "sight distance." 23 C.F.R. § 646.214(E). But this regulation merely states that a flashing signal might be necessary if the sight distance is "unusually restricted." It does not require railroads to select a track class based on sight distance—nor does any regulation establish the sight distance necessary for each track class. Quite simply, no relevant federal standard of care exists.

Despite the absence of a federal standard of care, Zimmerman may still avoid preemption if his claim falls

32

outside the scope of the original FRSA preemption provision. *See* 49 U.S.C. § 20106(a)(2). As we have previously made clear, state claims are within the scope of this provision if federal regulations "cover" or "substantially subsume" the subject matter of the claims. *Strozyk*, 358 F.3d at 273 (citing 49 U.S.C. § 20106(a)(2); *Easterwood*, 507 U.S. at 664). The regulations must do more than "touch upon or relate to that subject matter." *Easterwood*, 507 U.S. at 664 (internal quotation marks omitted).

The regulations in 49 C.F.R. pt. 213 subsume Zimmerman's misclassification claim. These regulations establish varying requirements for each class of tracks—governing everything from gage, alinement, and elevation, to crossties, curve speed, and rail joints. See 49 C.F.R. §§ 213.53 (explaining the proper method for measuring gage), 213.55 (creating alinement standards), 213.57 (establishing the maximum speed based on track elevation and curvature), 213.109 (requiring more crossties for higher track classes), 213.121 (noting that rail joints must "be of a structurally sound design").

The regulations are part of a broad scheme to standardize railroad tracks. Admittedly, there is no regulation that classifies tracks based on sight distance. But the breadth of the scheme implies a decision not to classify on that basis. At the very least, it implies that the federal government did not want states to decide how tracks would be classified. We doubt that the federal government would create a detailed system with the expectation that states would impose extra

33

classification requirements—especially given the risk that the requirements would vary from state to state. This regulatory scheme preempts Zimmerman's misclassification claim.

B

Zimmerman's second claim is that Norfolk Southern failed to maintain a safe crossing area. As before, we must address the threshold question of preemption. We then consider whether Zimmerman produced sufficient evidence to avoid summary judgment.

### *1. Zimmerman's claim of failure to maintain a safe crossing area is not preempted.*

Zimmerman makes two allegations in support of his unsafe-crossing claim. The first is that Norfolk Southern negligently maintained the crossing devices at Diller Avenue—in particular, "the sign that warned of the approaching crossing was covered by tree branches, the pavement markings no longer existed, and the crossbucks had been allowed to fall into disrepair." Appellant's Br. at 43. Zimmerman's second allegation is that Norfolk Southern failed to provide adequate sight distance.[10]

---

[10] Zimmerman also alleges that Norfolk Southern violated this duty by failing to provide flashing lights at the crossing. As we conclude in Part III.C below, the FRSA preemption provision bars claims of inadequate crossing devices.

34

*Strozyk* is directly on point. There, we considered a claim for wrongful death resulting from a crash at a railroad crossing. 358 F.3d at 270. The decedent's estate alleged that the railroad had failed to keep the crossing safe. We interpreted what is now subsection (a) of the FRSA preemption provision and explained that "[a] railroad may still be liable for other negligent conduct, such as the failure to maintain a working crossing arm . . . ." *Id.* at 276 (quoting *Evans Timber Co. v. Cent. of Ga. R.R. Co.*, 519 S.E.2d 706, 709–10 (Ga. Ct. App. 1999)); *see also Terrell v. Soo Line R.R. Co.*, No. 2:04-cv-095, 2005 WL 4882750, at *7 (S.D. Ind. Sept. 1, 2005) (noting that preemption would improperly insulate railroads "even if the crossbucks had fallen to the ground and were unobservable by a passing motorist"). We also concluded that 23 C.F.R. § 646.214(b)(3) does not preempt sight-distance claims, even though the regulation mentions "unusually restricted sight distance" as a factor that might require states to install flashing lights. We reasoned that "the plain language" of the regulation "indicates that the subject matter is the adequacy of warning devices, not the considerations involved in choosing them or state negligence law more broadly. . . . The bare mention of [conditions such as sight distance] does not indicate an intent to regulate those conditions." *Strozyk*, 358 F.3d at 273.

The 2007 FRSA amendment did not supersede *Strozyk*,[11] and thus both parts of Zimmerman's unsafe-crossing claim avoid preemption. *See id.* at 277 ("[The

---

[11] *See supra* Part II.

35

plantiffs'] claims that [the defendant] failed to maintain a safe grade crossing . . . and relatedly failed to ensure clear sight lines of oncoming trains are not preempted."). Even if *Strozyk* were not binding, Zimmerman's negligent-maintenance allegation would avoid preemption because 49 C.F.R. § 234.245 creates a federal standard of care governing the maintenance of crossbucks. 49 U.S.C. § 20106(b)(1)(A); *see* 49 C.F.R. §§ 234.245 ("Each sign mounted on a highway-rail grade crossing signal post shall be maintained in good condition and be visible to the highway user."), 234.3 (indicating that railroads are responsible for maintaining signs under § 234.245).[12]

> *2. Zimmerman produced sufficient evidence that Norfolk Southern failed to maintain the crossing devices and that the sight distance was inadequate.*

The District Court agreed that at least part of Zimmerman's second claim avoided preemption. The Court nevertheless granted summary judgment on his entire claim, concluding that he had failed to satisfy the elements of

---

[12] Zimmerman also produced a document from the Federal Railroad Administration that suggested the necessary sight distance was 376 feet. *See* J.A. 697. This document, however, does not create a standard of care for preemption purposes because the document is not "a regulation or order issued by the Secretary of Transportation." 49 U.S.C. § 20106.

36

negligence. In particular, the Court concluded that Norfolk Southern did not have "a duty to remove a privately owned building that potentially obscure[s] sight lines." *Zimmerman v. Norfolk S. Corp.*, No. 10-cv-02267, 2011 WL 3625039, at *12 n.9 (E.D. Pa. Aug. 17, 2011). Zimmerman argues that the District Court ignored his inadequate-maintenance allegation and misconstrued Pennsylvania law on the question of sight distance. We agree with Zimmerman—both parts of his second claim survive summary judgment.

We first consider Zimmerman's allegation that the warnings had fallen into disrepair. The well-worn elements of common-law negligence are, of course, duty, breach, causation, and damages. Under Pennsylvania law, railroads have a duty to maintain railroad warning devices. *Geelen v. Pa. R.R. Co.*, 161 A.2d 595, 598 (Pa. 1960) ("A railroad company is under a duty to maintain a public crossing in a state of good repair."); *see also Conner*, 263 F.2d at 946 (stating that under Pennsylvania law, a railroad might be liable for failing to maintain crossing devices); *Buchecker v. Reading Co.*, 412 A.2d 147, 153 (Pa. Super. Ct. 1979) (considering "evidence that the signal was not operating at the time" of the accident).[13]

---

[13] Judge Aldisert invokes the occupied-crossing rule to argue that Norfolk Southern did not have a duty to maintain the crossing devices. Neither party has mentioned this rule, and for good reason: it does not apply here. As the Pennsylvania Supreme Court has explained, the rule applies

37

According to Zimmerman, Norfolk Southern breached this duty because "the sign that warned of the approaching crossing was covered by tree branches, the pavement markings no longer existed, and the crossbucks had been allowed to fall into disrepair." Appellant's Br. at 43. Viewed in the light most favorable to Zimmerman, the record supports these allegations.

Photographs suggest that there once was a white line north of the crossing, but that the line had faded by the time

only when "an engine or a draft of cars is on the crossing or street or highway *and is visible to such highway users*." *Cella v. Pa. R. Co.*, 70 A.2d 638, 640 (Pa. 1950) (emphasis added). When both elements are met, "the presence of the engine or draft on the crossing or street [is] sufficient warning to [motorists] of the dangers incident thereto."*Id*. But a train's presence does not provide "sufficient warning" when it enters the crossing only after motorists have reached the point of no return. *See Krentz v. Consol. Rail Corp.*, 910 A.2d 20, 28 n.10 (Pa. 2006) (noting that, despite the occupied-crossing rule, "the law does impose a duty on railroads to warn of *approaching* trains").

Here, the train rushed into view at the last second. Because the train was not visible in time for Zimmerman to avoid the accident, *see* J.A. 687, the rule does not apply. A contrary holding would imply that a train racing down the tracks at double the speed limit would avoid liability whenever a motorist ran into it—even when the train's speed effectively prevented motorists from avoiding the collision.

of Zimmerman's collision. *See* J.A. 508, 716, 983.[14] Other photographs indicate that tree branches covered both the crossbuck and the yellow advanced warning sign. For example, a 2008 photograph shows that tree branches covered the yellow warning sign—although the picture is too dark and grainy to be conclusive. *See id.* 516. And a series of photographs from 2011 show that a tree standing next to the warning sign partially obscures the crossbuck—at least from the perspective of someone who is more than 250 feet away. *See id.* at 719–20.[15] Both parties cite an expert's statement that tree branches covered the crossbuck, *see* Appellant's Br. at 43 (citing J.A. 690); Appellee's Br. at 31 n.11 (same), but

---

[14] There is no painted line in a 2008 photograph, but there is a line in a 2011 photograph. *See* J.A. 508, 716, 983. Of course, subsequent remedial measures are inadmissible to prove negligence. *See* Fed. R. Evid. 407. Yet the paint in the 2011 photograph suggests that the pavement was painted before the 2008 accident, but that the marking faded and required a fresh coat of paint. This is not the only possible inference from the facts, but it is a "reasonable inference," which is all that is necessary at this stage. *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159–60 (3d Cir. 2003) (explaining the standard for summary judgment).

[15] According to Judge Aldisert, Zimmerman did not argue that tree branches covered the crossbuck—only that the crossbuck had fallen into disrepair. But if Norfolk Southern in fact allowed tree branches to cover the crossbuck, it seems accurate to say that it "allowed" the crossbuck "to fall into disrepair." Appellant's Br. at 43.

the expert's report mysteriously contains no such statement. Either way, a reasonable jury could accept Zimmerman's narrative based on the photographs.

Norfolk Southern also argues that there is insufficient evidence of causation. Darkness had fallen by the time Zimmerman began riding home. He may well have hit the train even if the obscuring branches had been pruned and the white line had been repainted. Yet in his deposition, Zimmerman said that he had crossed the track many times before the accident and that he believed the crossing was inactive. J.A. 235 ("[I] did not know that that track had a regular train on it. I have never seen a train on that track . . . . I certainly wasn't expecting—to my knowledge, it was an unused track."). From this testimony—and from the other evidence that the crossing was poorly maintained—it is reasonable to infer that state of disrepair at least contributed to his belief that the crossing was inactive. *See InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159–60 (3d Cir. 2003) ("When analyzing the sufficiency of the evidence, the court must view the facts and any reasonable inferences drawn therefrom in the light most favorable to the party opposing summary judgment."). As a result, it is also reasonable to infer that on the night of the accident, he approached the crossing with less caution than he otherwise would have.

We now turn to the allegation that Norfolk Southern failed to provide adequate sight distance. This allegation also survives summary judgment. Under Pennsylvania law, railroads have a duty to ensure that motorists are able to see

approaching trains. *See Fallon v. Penn Cent. Transp. Co.*, 279 A.2d 164, 167 (Pa. 1971). The District Court cited our opinion in *Strozyk* and concluded that the duty merely requires railroads to remove excess vegetation, as there is no "duty to modify or remove a privately owned building which is located off the railroad's right of way." *Zimmerman*, No. 10-cv-02267, 2011 WL 3625039, at \*12 n.9 (citing *Strozyk*, 358 F.3d at 276–77).

But Pennsylvania courts have held that the duty extends well beyond the removal of vegetation. In *Johnson v. Pa. R.R. Co.*, 160 A.2d 694 (Pa. 1960), a motorist's view was obstructed by buildings, utility poles, and a hedge. The Pennsylvania Supreme Court concluded:

> A railroad company may, in some instances have no choice as to location of crossings, . . . but where, as here, physical conditions visually blanket the speeding train until several short seconds before it sweeps, like a steel and iron tornado, into a crossing, a due responsibility for the safety of mankind dictates that something be done to alert the public of the omnipresent danger . . . .

*Id.* at 697. In *Fallon*, the Pennsylvania Supreme Court found sufficient evidence of negligence where the plaintiffs' view was obstructed by a building. 279 A.2d at 167. According to the court, "it was difficult if not impossible to gain an adequate view of the west-bound track without putting one's car in or dangerously close to the swath of an oncoming

41

train." *Id; see also Buchecker*, 412 A.2d at 156–57 ("[I]t is proper for the jury to take into consideration the physical conditions at the crossing . . . [and] the nature of the surroundings.") (citing *Cummings v. Pa. R.R.*, 151 A. 590, 591 (Pa. 1930)). To be sure, no Pennsylvania court has expressly held that railroads have a clear duty to modify private buildings. But cases such as *Johnson* and *Fallon* have indicated that the jury should consider privately owned buildings when deciding whether the railroad breached its duty to provide adequate sight distance.

We conclude that the building in this case is relevant in deciding whether Norfolk Southern provided adequate sight distance. The jury can decide whether Norfolk Southern should have asked the building's owner to remove a sign that was along Diller Avenue. Norfolk Southern even had a policy for doing so: "If an obstruction is located off the right-of-way, the owners of the land containing the obstruction should be contacted personally and an appeal made to the landowner to remove the obstruction. The personal contact should be followed up with a letter, with a copy to the appropriate state agency." J.A. 1051. If the appeal fails, "the matter should be referred to the Law Department for guidance," *id.*, presumably to decide whether to use eminent domain under 15 Pa. Cons. Stat. § 1511 (allowing public utility corporations such as railroads to use eminent domain).

The jury can also decide whether Norfolk Southern should have enlisted the help of the Commonwealth or used eminent domain. And if the jury decides that Norfolk

42

Southern breached its duty, Norfolk Southern's policy and 15 Pa. Cons. Stat. § 1511 might be evidence of causation. They suggest that Norfolk Southern could have improved conditions at the crossing in a way that would have prevented the accident.[16]

Zimmerman's second claim is far from overwhelming—the evidence of disrepair is conflicting, and it is unclear whether Norfolk Southern's inaction caused the

---

[16] Judge Aldisert invokes the longstanding duty to "stop, look, and listen" and argues that Norfolk Southern did not have an obligation in this case to provide adequate sight distance. *See Briach v. Pa. R.R. Co.*, 462 F.2d 266, 268 (3d Cir. 1972); 75 Pa. C.S. § 3341(a). Zimmerman supposedly violated this duty because he did not stop before crossing the tracks. This might be true, but Zimmerman's negligence is a separate question. As the Pennsylvania Superior Court has explained, "one who fails to stop, look, and listen will not be precluded from recovery *where the failure is not negligent.*" *Buchecker v. Reading Co.*, 412 A.2d 147, 154 (Pa. Super. 1979) (emphasis added).

The District Court explicitly refrained from deciding whether Zimmerman was negligent. *Zimmerman*, 2011 WL 3625039, at *21 n.34 ("I do not need to consider defendant's additional arguments that plaintiff was comparatively negligent by failing to comply with Pennsylvania law."). And neither side has addressed the question of Zimmerman's negligence on appeal. We therefore refuse to affirm on these grounds.

43

sight distance to remain inadequate. All the same, we must construe the evidence in the light most favorable to Zimmerman. There is sufficient evidence of each element to allow the claim to go forward.

C

Zimmerman's third and final claim is that Norfolk Southern was negligent per se for violating various requirements in 23 C.F.R. § 646.214(b).[17] In particular, subsection (b)(3)(i) states that crossings with limited sight distance and high train speeds must have "adequate warning devices," defined in the statute as automatic gates and flashing lights. And subsection (b)(1) states that all "traffic control devices" must comply with the Manual on Uniform Traffic Control Devices. Zimmerman asserts that Norfolk Southern violated both provisions. The District Court decided that the claim was preempted.

We agree that Zimmerman's third claim is preempted. For starters, neither regulation creates a federal standard of care. *See* 49 U.S.C. § 20106(b)(1)(A). We analyze the regulations separately. Subsection (b)(3)(i)(C) states:

---

[17] Zimmerman also identifies a number of internal rules that Norfolk Southern supposedly violated. These supposed violations do not help Zimmerman avoid preemption because he fails to show the internal rules were "created pursuant to a regulation or order." 49 U.S.C. § 20106(b)(1)(B).

44

Adequate warning devices . . . on any project where Federal-aid funds participate in the installation of the devices are to include automatic gates with flashing light signals when . . . the following conditions exist: . . . High Speed train operation combined with limited sight distance at either single or multiple track crossings.

Zimmerman argues that subsection (b)(3) creates a federal standard of care—one that requires Norfolk Southern to install automatic gates and flashing lights—because the sight distance at the Diller Avenue crossing is limited.

The Eighth and Tenth Circuits have rejected similar arguments. *See Grade*, 676 F.3d at 686–87 (concluding that 23 C.F.R. § 646.214(b)(3) and (4) preempt claims against railroads for installing inadequate warning devices at railroad crossings); *Henning*, 530 F.3d at 1215 (same). Subsection (b)(3) does not impose on railroads an ongoing duty—instead, it "displace[s] state and private decisionmaking authority." *Henning*, 530 F.3d at 1212 (quoting *Easterwood*, 607 U.S. at 670) (internal quotation marks omitted). More importantly, subsection (b)(3) "place[s] the responsibility for implementing adequate warning devices on the State, thereby preempting any cause of action alleging a railroad failed to properly install an adequate warning device." *Grade* 676 F.3d at 686. Railroads cannot, "as a matter of law, fail to comply" with subsection (b)(3). *Id.* (quoting *Henning*, 530 F.3d at 1215).

45

We find this reasoning persuasive. The Commonwealth of Pennsylvania installed crossbucks at the Diller Avenue crossing with the use of federal funds and the help of the crossing's previous owner. Norfolk Southern, as the current owner, has a duty to maintain the crossing devices. *See Strozyk*, 358 F.3d at 276. But the Commonwealth is ultimately responsible for ensuring that the devices comply with subsection (b)(3). As a result, subsection (b)(3) does not impose on Norfolk Southern a federal standard of care.

The same is true of subsection (b)(1). Zimmerman tries to avoid *Grade* and *Henning* by asserting that Norfolk Southern also violated subsection (b)(1):

> All traffic control devices proposed shall comply with the latest edition of the Manual on Uniform Traffic Control Devices for Streets and Highways supplemented to the extent applicable by State standards.

Zimmerman argues that subsection (b)(1) imposes on railroads an ongoing duty to update their crossing devices. Norfolk Southern violated this supposed duty by failing to update the crossbucks to comply with the latest Manual on Uniform Traffic Control Devices. This argument is inconsistent with the text, which requires that "proposed" devices—not already existing devices—comply with the manual. Moreover, subsection (b)(1) is part of the same scheme as subsection (b)(3). Both subsections create rules that states must obey to receive federal funds. Neither imposes on railroads a standard of care.

46

Absent a federal standard, Zimmerman can avoid preemption only if there are no federal regulations that cover the subject matter of his inadequate-device claim. 49 U.S.C. § 20106(a)(2). Unfortunately for Zimmerman, the Supreme Court has already concluded that subsections (b)(3) and (b)(4) cover the subject matter of such claims. *See Shanklin*, 529 U.S. at 352–53 (citing *Easterwood*, 507 U.S. at 670). These regulations are preemptive because they "displace state and private decisionmaking authority by establishing a federal-law requirement that certain protective devices be installed or federal approval obtained." *Easterwood*, 507 U.S. at 670. Zimmerman tries to escape preemption by citing the Supreme Court's statement that subsection (b)(1) "does not pre-empt state tort actions." *Shanklin*, 529 U.S. at 352. But this language does not save Zimmerman's claim—subsections (b)(3) and (b)(4) clearly preempt his inadequate-device claim. It is of no consequence whether subsection (b)(1) does the same.

Zimmerman is unable to avoid preemption by asserting that Norfolk Southern installed the wrong warning devices—even though he was able to avoid preemption by asserting that Norfolk Southern failed to maintain them. *See supra* Part III.B.1. While it may seem that this scheme is internally inconsistent, it is nonetheless the scheme Congress has established.

IV

Accordingly, we will reverse the District Court's grant of summary judgment on Zimmerman's first and second

47

claims but affirm its grant of summary judgment on Zimmerman's third claim.

ALDISERT, <u>Circuit Judge</u>, Dissenting, and Concurring in Part

Robert Zimmerman appeals from an order of the District Court, which granted Norfolk Southern Corporation's motion for summary judgment. He had filed a civil complaint against Norfolk Southern Corporation ("Norfolk Southern") in the District Court seeking damages for injuries sustained when he abruptly applied his motorcycle brakes at a railroad crossing and flew over the motorcycle's handlebars, colliding with the side of a lead train engine proceeding over the crossing. He bottomed his personal injury claim against the railroad on (1) negligent failure to warn of an approaching train; (2) negligent failure to maintain a safe grade crossing area; and (3) negligence per se for violating various portions of 23 C.F.R. § 646.214(b) (adequate warning devices). I would affirm the judgment of the United States District Court for the Eastern District of Pennsylvania in its entirety.

Accordingly, I join that portion of the majority opinion that affirms the District Court's determination that Zimmerman's negligence per se claim, set forth above as the third issue, is preempted. I concur also in the majority's approach to analyzing the Federal Railroad Safety Act ("FRSA") preemption provision, codified at 49 U.S.C. § 20106. I am unable to agree with the majority's reversal of the judgment on the two other issues presented to us. I therefore join Parts II and III C of the majority opinion and dissent as to Parts III A and B.

I.

1

On the evening of June 12, 2008, Robert Zimmerman was operating his motorcycle southward on Diller Avenue in New Holland, Pennsylvania. He was wearing a full-face helmet with a visor and was familiar with the Diller Avenue railroad crossing because he had traveled down Diller Avenue and through the crossing "hundreds" of times before this incident. App. 00230. At approximately 10 p.m. that evening, two locomotives owned by Norfolk Southern—Engine 5657 and Engine 5656—approached Diller Avenue. The engineer, Douglas Eppley, and the conductor, Stephen Romberger, were stationed in the head of the lead locomotive, Engine 5657. As the train entered the Diller Avenue crossing, Zimmerman, who had been traveling on his motorcycle approximately 30 to 35 miles per hour, abruptly applied his brakes and flew over the handlebars of his motorcycle. His body struck the side of the fuel tank portion of the lead engine. As a result of the collision, Zimmerman sustained extensive injuries and was airlifted to Lancaster General Hospital. He was subsequently transferred to a rehabilitation center, where he remained until his discharge in October 2008. He was left partially paralyzed.

Norfolk Southern operates the railroad crossing at Diller Avenue. The crossing protects southbound motorists with a crossbuck[1] on the side of the road in accordance with the Manual on Uniform Traffic Control Devices ("MUTCD"). This was a reflectorized crossbuck installed in

---

[1] A crossbuck is an X-shaped sign that reads: "Railroad Crossing," and "requires road users to yield the right-of-way to rail traffic at a highway-rail grade crossing." U.S. Dept. of Transp. Fed. Highway Admin., Manual on Uniform Traffic Control Devices, 542 (2009).

1987. Norfolk Southern also placed a black-and-yellow railroad-grade crossing sign approximately 150 feet north of the crossing. The company neither possesses nor controls any land or property in the vicinity of the Diller Avenue crossing other than its right-of-way.

Train conductor Romberger was positioned in the lead locomotive of a two-engine train. Positioned on the left side, he saw the motorcycle approaching when Zimmerman was approximately 50 feet from the crossing, and he realized that, "given Mr. Zimmerman's speed[,] . . . he was going to collide with us." App. 00113. Zimmerman's body collided with the fuel tank of the lead engine of the train approximately 30 feet from its front leading edge. The crossing is only 29 feet wide. The lead engine, therefore, was already through the crossing at the time Zimmerman collided with the train.

Zimmerman has no present recollection of the incident.[2] Two independent witnesses, Seth Huyard and Chad Kaufman, who were traveling in a truck approximately 60 feet behind Zimmerman on Diller Avenue, both "heard the train blowing its horn" as they approached the railroad

---

[2] Because Zimmerman was unable to testify about the relevant aspects of the event, I reject the majority opinion's reference to his alleged observations before his collision with the side of the train. The majority opinion states that "[w]hen he was less than seventy-six feet away, he noticed that a train was approaching. He tried to stop, but his front brake locked and he flew over the handlebars, colliding headfirst with a locomotive." Majority Opinion 2-3. In Zimmerman's deposition, he stated that he did not recall seeing the train on the night of the accident. App. 00236-00237.

crossing. App. 00520-00521. Huyard, the truck's driver, stated that "as the train entered the intersection the motorcycle rider appeared to apply his front brake causing him to go over the handlebars." App. 00520. Kaufman, who was riding in the truck, saw "the train cross Diller Avenue. [He] then saw the motorcycle go into the side of the train." App. 00521.

At the time of the collision, each locomotive was equipped with a digital recording device, known as an Event Data Recorder ("EDR"), which recorded information such as speed and horn activation. According to the EDR, the train was traveling at approximately 24 miles per hour at the time of the collision. The EDR also recorded that the train horn was activated beginning at a point of approximately one-quarter mile prior to the crossing and continued through the crossing, sounding for a total of 45 seconds.

On May 14, 2010, Zimmerman filed a four-count civil complaint against Norfolk Southern. On March 31, 2011, Norfolk Southern filed a motion for summary judgment, which the Court granted on August 17, 2011. Zimmerman timely appealed.

II.

In reviewing a district court's grant of summary judgment, we exercise plenary review. See Gallo v. City of Phila., 161 F.3d 217, 221 (3d Cir. 1998). We apply the same test as a district court applies, see Waldorf v. Shuta, 896 F.2d 723, 728 (3d Cir. 1990), and will affirm if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Rule 56(a), Federal

Rules of Civil Procedure. Facts must be viewed in the light most favorable to the non-moving party. See Monroe v. Beard, 536 F.3d 198, 206 (3d Cir. 2008) (citation omitted).

## III.

Zimmerman offers a number of reasons in support of his contention that the District Court erred in granting the motion for summary judgment. He asserts that his claims of negligence based on (1) inadequate signals and (2) excessive speed are not preempted. He contends also that the District Court erred in finding that no genuine issue of material fact exists as to his claims of negligence based on a common-law duty the railroad owed to (3) maintain a reasonably safe crossing and (4) provide adequate sight distance. Finally, he argues that the District Court erred in holding that certain documents, relevant to his excessive speed allegation, were privileged. For the reasons that follow, I would affirm the District Court's judgment.

I would conclude that the District Court properly held that Zimmerman's claims of negligence based on inadequate signals and excessive speed are preempted. With regard to Zimmerman's common-law claims that Norfolk Southern failed to maintain a reasonably safe crossing and provide adequate sight distance, I would furthermore conclude that the District Court did not err in granting summary judgment in favor of Norfolk Southern, because Zimmerman failed to establish a prima facie claim of negligence and therefore no genuine issue of material fact exists. Finally, I would conclude that the Court correctly held that the documents related to his excessive speed allegation were privileged.

Summary judgment was therefore appropriate and, as stated heretofore, I would affirm the entire District Court judgment.

IV.

For part of his negligence claims, Zimmerman alleges that Norfolk Southern failed to maintain a safe crossing at Diller Avenue. He alleges that the railroad negligently maintained the crossing devices, and that the railroad failed to provide adequate sight distance, thereby preventing him from seeing the train that he struck until it was too late for him to avoid the collision. We have long recognized that railroads have a duty to provide a safe crossing, including adequate sight distances. See Strozyk v. Norfolk S. Corp, 358 F.3d 268, 277 (3d Cir. 2004) ("A railroad must 'exercise ordinary care at a crossing by adopting a reasonably safe and effective method, commensurate with the dangers of a particular crossing, of warning travelers of the approach of the train.'") (quoting Nat'l Freight v. Se. Pa. Transp. Auth., 698 F. Supp. 74, 78 (E.D. Pa. 1988), aff'd, 872 F.2d 413 (3d Cir. 1989)). Indeed, where "physical conditions visually blanket the speeding train until several short seconds before it sweeps . . . into a crossing, a due responsibility for the safety of mankind dictates that something be done to alert the public . . . above that of asking it to stop, look, and listen." Johnson v. Penn. R.R. Co., 160 A.2d 694, 697 (Pa. 1960).

At the same time, a motorist planning to drive through a crossing is required to respect the common law of Pennsylvania and the relevant statutes of that state. Thus, upon the sounding of the train's horn, Zimmerman had to obey the following provisions of 75 Pa. C.S.A. § 3341(a):

6

Whenever any person driving a vehicle approaches a railroad grade crossing . . . the driver of the vehicle shall stop within 50 feet but not less than 15 feet from the nearest rail of the railroad and shall not proceed until it can be done safely. The foregoing requirement shall apply upon the occurrence of . . . the following circumstance[]:

. . .

(3) A railroad train approaching within approximately 1,500 feet of the highway crossing emits a signal audible from that distance and the railroad train, by reason of its speed or nearness to the crossing, is a hazard.

Moreover, ruling case law of Pennsylvania teaches:

When a motorist approaches a railroad crossing that is *occupied by a train*, whether the train is traveling or stationary, the only duties involved are those of the motorist, namely:

 . . .

(2) "to stop, look and listen before entering upon the crossing."

Krentz v. Consol. Rail Corp., 910 A.2d 20, 28 (Pa. 2006) (emphasis added) (citing Hogg v. Bessemer & Lake Erie R.R. Co., 96 A.2d 879, 884 (Pa. 1953)).

Krentz was the Pennsylvania Supreme Court's latest application of the venerable Occupied Crossing Rule, which

7

"is as securely affixed to [Pennsylvania] jurisprudence as train tracks are to the land that they traverse." Krentz, 910 A.2d at 27. Under that rule, "'a railroad company cannot ordinarily be found negligent because it failed to station guards or light the car, or otherwise give warning of its presence in the highway,'" id. (quoting Cella v. Pa. R.R. Co., 70 A.2d 638, 640 (Pa. 1950), and this rule applies regardless of whether the train is moving or stationary, id. at 27 n.9 (citing Cella, 70 A.2d at 639). The train's presence in the crossing is "sufficient notice of its presence to warn any person using the highway with ordinary care." Id. at 27.

The duty to stop, look and listen before entering a crossing, particularly a crossing that is occupied, is best expressed by the Pennsylvania Supreme Court's statement in Serfas v. Lehigh and N.E. R. Co., 113 A. 370, 370-371 (Pa. 1921): "The [plaintiff] openly violated the inflexible rule requiring the traveler to stop, look, and listen before entering upon a railroad track . . . . 'It is not a rule of evidence, but a rule of law, peremptory, absolute and unbending and the jury can never be permitted to ignore it, to evade it, or to pare it away by distinctions and exceptions.'" (quoting Pa. R.R. Co. v. Aiken, 18 A. 619, 620 (Pa. 1889)).

The Occupied Crossing Rule has a long history in the Commonwealth of Pennsylvania, dating back to the Court's 1938 opinion in Everetts v. Pa. R.R. Co., 198 A. 796 (Pa. 1938) (per curiam). Although the rule arose during the era of contributory negligence, it has survived the 1978 adoption of the comparative negligence doctrine in Pennsylvania. See Krentz, 910 A.2d at 28 (stating that "'the enactment of the Comparative Negligence Act does not change the well established rule that negligence cannot be found where the

8

law does not impose a duty'") (quoting <u>Sprenkel v. Consol. Rail Corp.</u>, 666 A.2d 1099, 1102 (Pa. Super. 1995)).

Zimmerman's allegation that the crossing devices were negligently maintained is a failure to warn claim. He argues that Norfolk Southern breached a duty to maintain railroad warning devices because "the sign that warned of the approaching crossing was covered by tree branches, the pavement markings no longer existed, and the crossbucks had been allowed to fall into disrepair." Brief of Appellant 43. Because he contends that the railroad failed to warn him of the danger at the crossing, we must determine whether any duty to warn was in fact owed to him by the railroad given the circumstances of the accident. <u>See</u> <u>Krentz</u>, 910 A.2d at 28.

Zimmerman, upon reaching the grade crossing, abruptly applied his brakes and flew over the handlebars of his motorcycle, striking a moving train. That moving train occupied the crossing at the time he struck it, triggering application of the Occupied Crossing Rule. As stated previously, a motorist approaching an occupied crossing has the duty to stop, look, and listen before entering the crossing; the railroad has no duty to warn of an occupied crossing. <u>Id.</u> As the <u>Krentz</u> Court notes in a footnote, railroads do in fact have a duty to warn of approaching trains. <u>Id.</u> at n.10. Here, however, the lead engine already occupied the crossing at the time Zimmerman struck it. He struck the train at a point approximately 30 feet from the front of its lead engine, at a crossing that is only 29 feet wide. This is neither a matter of contributory nor comparative negligence; rather, Zimmerman cannot maintain his negligent maintenance of crossing

devices claim because Norfolk Southern had no duty to warn of an occupied crossing.[3]

Zimmerman's inadequate sight distance claim is also, at its core, a failure to warn claim. An adequate sight distance is one means of providing motorists with warning that a train is approaching. Here, as with the negligent maintenance of crossing devices allegation, Zimmerman cannot maintain his inadequate sight distance claim because the train that Zimmerman struck occupied the crossing, triggering application of the Occupied Crossing Rule.

This issue is not controlled by controverted facts but by fundamental precepts of negligence, under which a plaintiff must first establish that a defendant does in fact have a duty. Here, application of the Occupied Crossing Rule would compel us to hold that summary judgment was appropriate because the railroad had no duty to warn of the presence of the train that occupied the crossing at Diller Avenue. Nevertheless, to address the specific points made by

---

[3] The majority's footnote 13 states that the Occupied Crossing Rule does not apply because "[h]ere, the train rushed into view at the last second," and "the train was not visible in time for Zimmerman to avoid the accident[.]" The train did indeed arrive at the crossing shortly before Zimmerman struck it, but it fully occupied the crossing at the moment of impact. As the majority states, railroads still have a duty to warn of approaching trains; here, the record before us shows that the lead engine's headlight was on "full" and the horn had been blowing for one-quarter mile, or 45 seconds, such that two people traveling 60 feet behind Zimmerman could hear the horn as the train approached the Diller Avenue crossing.

the majority, I now turn to the common-law duties to maintain a safe crossing and provide adequate sight distances.

V.

I would hold that the District Court properly granted summary judgment in favor of Norfolk Southern because, even assuming that the railroad owed duties to Zimmerman under the circumstances of the accident, no genuine issue of material fact exists as to those duties.

The District Court noted "that the Third Circuit in Strozyk held that § 646.214(b) only preempts claims regarding the adequacy of warning devices, and does not preempt the common-law duty to maintain a safe grade crossing." App. 00032. The Court explained that "railroads continue to have the common-law duty 'to provide a reasonably safe grade crossing,' 'such as the duty to keep visibility at grade crossings free from obstructions." Id. (quoting Strozyk, 358 F.3d at 276-277). I, along with the majority, agree with the District Court's conclusion that this claim was not preempted. Although the claim was not preempted, the District Court nevertheless granted Norfolk Southern's motion for summary judgment because Zimmerman had not made a prima facie claim for negligence. The Court determined that Zimmerman failed to establish that Norfolk Southern: (1) had a duty to remove a privately owned building, located off of the railroad's right-of-way, that potentially obscured sight lines; and (2) negligently failed to maintain a reasonably safe crossing. Accordingly, the District Court held that there was no genuine issue of material fact and that summary judgment was appropriate. Whereas the majority states that "[t]here is sufficient evidence of each

11

element to allow the claim to go forward," Majority Opinion 44, I disagree and would hold that the District Court correctly granted summary judgment.

## VI.

In determining whether summary judgment was appropriate here, I must therefore determine whether any genuine issue of material fact exists as to Norfolk Southern's common-law duties of care.

To establish a prima facie case for negligence under the common-law theory that Norfolk Southern failed to maintain a reasonably safe crossing by negligently maintaining the crossing devices and failing to provide adequate sight distance, Zimmerman had to adduce facts that demonstrate: (1) a duty or obligation recognized by law; (2) a breach of that duty; (3) a causal connection between the breach and the resulting injury; and (4) actual loss suffered by him. See Rooney v. City of Phila., 623 F. Supp. 2d 644, 660 (E.D. Pa. 2009).

## A.

Zimmerman asserts that Norfolk Southern allowed the warnings at the Diller Avenue crossing to fall into disrepair, breaching its duty to maintain warning devices at the crossing. According to the majority, the record supports his allegations that the warning sign was covered by tree branches, that pavement markings no longer existed, and that the crossbucks had been permitted to fall into disrepair. Majority Opinion 38. With regard to the tree branches, Zimmerman has failed to put forth competent evidence

12

demonstrating that the foliage blocked his view of the advance warning sign on the day of the accident. Curiously, the majority points to photographs taken in 2011 to support the proposition that tree branches blocked the view of the warning sign in 2008 at the time of the accident. The only competent evidence of the condition of the foliage near the time of the accident is set forth at pages 00503-00519 of the Appendix. From these photographs, taken the day after the accident, it appears that the foliage did not block the advanced warning sign. See App. 00515 (picture taken 191 feet north of the crossing). Even if we were to use the photographs taken in 2011, the advanced warning sign does not appear to be obscured by foliage from at least as far as 300 feet north of the crossing.

The majority refers to tree branches covering the crossbucks, but Zimmerman's assertion regarding the crossbucks is that they were in "disrepair," not that they too were covered by foliage. As to this assertion, he likewise has offered no competent evidence that the crossbucks were in disrepair at the time of the accident. Finally, although the majority has determined that "[p]hotographs suggest there once was a white line north of the crossing, but that the line had faded" by the time of the accident, Majority Opinion 38-39, I conclude that there is no competent evidence to support this proposition. I agree that there does not appear to have been a painted line north of the crossing in 2008, judging from the photographs taken one day after the accident. Interpreting facts in the light most favorable to Zimmerman, however, does not require us to decide that evidence of fresh paint in 2011 means that the lines existed at some point prior to the accident, but later faded such that they needed repainting.

13

The majority rejects Norfolk Southern's causation argument, but here it has misconstrued Zimmerman's own testimony regarding the impact of his many crossings at the Diller Avenue crossing. According to the majority, "in his deposition, Zimmerman said that he had crossed the track many times before the accident and that he believed the crossing was inactive." Majority Opinion 40 (citing App. 00235). The majority states also that from Zimmerman's testimony, combined with evidence of poor maintenance of the crossing, "it is reasonable to infer that state of disrepair at least contributed to his belief that the crossing was inactive." Id. at 40. However, a closer reading of the cited portions of Zimmerman's deposition testimony is instructive. Zimmerman stated, "[I] did not know that that track had a regular train on it. I have never seen a train on that track, and so I don't know what—when I would have actually looked to see if a train was coming. I certainly wasn't expecting—to my knowledge, it was an unused track." App. 00235. Later, he stated "I mean, like I said, I never expected to see a train there." App. 00236. Zimmerman now wishes to recharacterize his reason for believing that the crossing was inactive to be the result of Norfolk Southern's failure to maintain warning devices. His deposition testimony makes it clear, however, that he believed the crossing was inactive because he had never seen a train on that track, over his years in the area and hundreds of trips down Diller Avenue.

Accordingly, I would hold that the District Court correctly granted summary judgment on the negligent failure to maintain crossing devices portion of Zimmerman's failure to maintain a safe crossing claim.

B.

Next, Zimmerman contends that Norfolk Southern negligently failed to maintain a safe crossing when it failed to remove an obstruction, even though the obstruction was not located on the railroad's right-of-way. Indeed, Norfolk Southern neither possessed nor controlled any land beyond its narrow right-of-way in the area of the Diller Avenue crossing. Although he relies on Fallon v. Penn Cent. Transp. Co., 279 A.2d 164 (Pa. 1971), to support his contention that Norfolk Southern had a duty to remove the building, the teachings of Fallon do not support this position. That case states that railroads have a special duty of care towards those who use a crossing with a "dangerously limited view," and that duty is to "regulate the running of its trains as to make it possible for a driver to cross the tracks in safety *if, when just before entering upon them, he stopped, looked and listened, and no train was within sight or sound*." Id. at 167 (emphasis added) (internal quotation marks and citations omitted). The majority, paraphrasing Fallon, states broadly that under Pennsylvania law, "railroads have a duty to ensure that motorists are able to see approaching trains." Majority Opinion 40-41. As is clear from the emphasized language above, this is an incomplete statement of the law.

The stop, look and listen rule, like the Occupied Crossing Rule, has a long history in Pennsylvania. In Briach v. Pa. R.R. Co., 462 F.2d 266 (3d Cir. 1972), this Court traced the origins of the stop, look and listen rule, noting that "[d]evelopment of the so-called 'stop, look and listen' doctrine originated over a century ago," in the case of Reeves v. Del., Lackawanna & W. R.R. Co., 30 Pa. 454 (Pa. 1858), where "the court determined that a traveler on a public

15

highway 'is bound to stop and look out for trains.'" Briach, 462 F.2d at 268. Later cases held that failure to stop and look constituted negligence per se, and the requirement to listen was added to the rule in 1867. Id. at 268-269. By 1873, the Pennsylvania Supreme Court "stated that the duty to 'stop, look and listen' was an 'unbending' rule of law and failure to comply with any one of the three absolutes constituted negligence as a matter of law." Id. at 269 (quoting Pa. R.R. Co. v. Beale, 73 Pa. 504 (1873)). By 1972, this Court noted that recent case law from the Pennsylvania Supreme Court affirmed and utilized the stop, look and listen rule. Id.

All of these cases, as well as Briach, pre-dated the Legislature's adoption of the Comparative Negligence Act. However, like the Occupied Crossing Rule, "the common law 'stop, look, and listen' rule has survived the Legislature's abolishment of contributory negligence." Krentz, 910 A.2d at 29. Although under the Comparative Negligence Act a plaintiff's failure to stop, look and listen no longer constitutes an absolute bar to recovery in all railroad-crossing cases, *here the long-standing obligation is embedded within the railroad's duty to provide an adequate sight distance*. The special duty under Fallon, which is triggered when a dangerously limited view exists, requires a railroad to make it possible for a driver to safely cross the tracks *if* that driver stops, looks and listens, and no train is within sight or sound.

At a crossing with a dangerously limited view, a railroad is only required to regulate the running of its trains to make safe crossing possible for drivers who stop, look and listen. This is not to say that Zimmerman cannot recover *because* he did not stop, look and listen; I would hold that where a plaintiff cannot show that a railroad violated its duty

16

under <u>Fallon</u>—that is, the duty to run its trains in a manner that makes it safe for a driver to cross tracks after stopping, looking and listening for trains—summary judgment is appropriate. Based on the record, Zimmerman presented no evidence to establish that Norfolk Southern violated its special duty under <u>Fallon</u>.

The record before us shows that the lead engine's headlight was on "full" and the horn had been blowing for one-quarter of a mile, or 45 seconds, such that two people traveling 60 feet behind Zimmerman could hear the horn as the train approached the Diller Avenue crossing. Zimmerman does not, and cannot, maintain that he stopped, looked and listened prior to crossing the tracks or that, even if he had, he would have nonetheless been harmed. He has represented that he has no present recollection of the events concerning his approach to the crossing and the collision. Not a whit of evidence was provided that he complied with the venerable stop, look and listen precepts of Pennsylvania law. Moreover, no contention is presented by brief or oral argument that he did so.

It must be noted that the requirement to stop, look and listen is not abrogated merely because the motorist's view is obstructed at one point but not another. <u>See</u> <u>Benner v. Phila. & R. Ry. Co.</u>, 105 A. 283, 285 (Pa. 1918) ("It is further argued that [plaintiff] was relieved from the obligation to stop because of the obstructions which prevented his view before crossing . . . but, if this be true, another duty was imposed upon him. It was his duty to alight and go to a point where he could make a proper observation."). Zimmerman admitted that he could have seen the approaching train when he was "within less than forty feet of the crossing." App. 00073. But,

when he came to that point where he could have seen the train, he did not "stop, look and listen," as required by Pennsylvania law. He now asks us to hold the railroad at fault for his own failure to follow the law. I would not do so. Zimmerman offered no evidence that he had obeyed a fundamental maxim of the law formidably designed to prevent him from crashing into the side of a passing train. Accordingly, no genuine issue of material fact exists as to whether Norfolk Southern met its duty of care.

## C.

I conclude therefore that no genuine issue of material fact exists regarding Norfolk Southern's maintenance of the Diller Avenue crossing.

Notwithstanding my conclusion that Zimmerman failed to establish a prima facie claim of negligence under state law, he asserts that a claim was nevertheless made, and thus a genuine issue of material fact exists, based on the railroad's violation of its internal policy to contact landowners with obstructions located off of the railroad's right-of-way, which was "created pursuant to [federal] regulation." See 49 U.S.C. § 20106(b)(1)(B). This argument is unpersuasive. He contends that the railroad's policy regarding sight obstructions was issued pursuant to 49 C.F.R. §§ 217.7, 217.11, and 218.1. These regulations, however, do not require railroads to create specific policies but merely require a railroad to keep copies of its operating rules and timetables, see § 217.7, and to keep records of its program of instruction to help employees learn the railroad's operating rules, see § 217.11. Section 218.1 merely states that the regulations provide minimum requirements and that railroads

18

are free to prescribe more stringent rules. He has failed to identify any regulation requiring Norfolk Southern to adopt the alleged policy at issue.

Furthermore, nothing in 49 U.S.C. § 20106 creates a private right of action for a railroad's failure to comply with any internal policy which it created and which was not otherwise created pursuant to a federal regulation. Zimmerman's broad interpretation of § 20106, such that Norfolk Southern's internal policy was "created pursuant to a regulation," is not supported by the statute's text. As the District Court properly noted, "[s]uch an interpretation would discourage railroads from otherwise implementing internal policies in order to avoid additional self-imposed duties of care." App. 00033.

I conclude, therefore, that although the common-law duty to maintain a safe crossing area—including the duties to maintain crossing devices and to provide adequate sight distance—is not preempted by federal law, the District Court nevertheless properly granted summary judgment as to this claim because Zimmerman failed to establish a prima facie claim that the railroad breached its duty.

VII.

The majority elects not to confront the critical Pennsylvania stop, look and listen rule, stating:

> The District Court explicitly refrained from deciding whether Zimmerman was negligent. Zimmerman, 2011 WL 3625039 at *21 n. 34 ("I do not need to consider defendant's additional

19

arguments that plaintiff was comparatively negligent by failing to comply with Pennsylvania law."). And neither side has addressed the question of Zimmerman's negligence on appeal. We therefore refuse to affirm on these grounds.

Majority Opinion 43 n.16.

The majority's position requires special attention. First, "stop, look and listen" is language that appears in more than one place and for more than one reason: it is used not only to impose a duty on motorists, see 75 Pa. C.S.A. § 3341(a), but also to limit the duty owed by railroads, see Fallon v. Penn Cent. Transp. Co., 279 A.2d 164 (Pa. 1971). I do not affirm the District Court's judgment on the ground that Zimmerman was negligent, but on the ground that even if we accept as true all Zimmerman has alleged in connection to his inadequate-sight-distance claim, he cannot establish that the railroad breached its limited common law duty to "regulate the running of its trains as to make it possible for a driver to cross the tracks in safety *if, when just before entering upon them, he stopped, looked and listened, and no train was within sight or sound.*" Id. at 167 (emphasis added) (internal quotation marks and citations omitted).

Second, I wish to make clear that my colleagues did not suggest that I lacked *jurisdiction* to discuss the implications of the stop, look and listen rule. Instead, they choose to "refuse to affirm on these grounds." Had the majority challenged this Court's jurisdiction to consider this, they would have gotten nowhere, for an appellate court is authorized to affirm a district court's judgment for reasons

20

other than those stated by the trial court, as long as the record supports the judgment. <u>See</u> <u>Guthrie v. Lady Jane Collieries, Inc.</u>, 722 F.2d 1141, 1145 n.1 (3d Cir. 1983) (citing <u>Helvering v. Gowran</u>, 302 U.S. 238, 245 (1937). Similarly, an appellate court is not shackled to the briefs or oral argument of counsel. An appellate court is not stripped of jurisdiction to discuss an important—if not the most important—relevant precept of law where, as here, a motorist operates his vehicle into the side of a railroad train proceeding though a street crossing merely because (1) a district court refuses to discuss it even though raised by the defendant, and (2) the appellate lawyers decide not to discuss it by brief or oral argument. The issue was raised in the District Court. That vests in me the authority to consider it on appeal.

In electing to refuse to consider the impact of Zimmerman's failure to "stop, look and listen" as a grounds that may warrant affirming the District Court, the majority reflects a theory of jurisprudence that has been rejected in America for almost 100 years. This jurisprudence of concepts was known by the Germans as *Begriffsjurisprudenz*, and was the theory behind the 17th Century movement to codify the law in much of Europe. Later, the prominent German jurisprudent Rudolf von Ihering insisted that the first question should be how will a rule or a decision operate in practice and advocated a jurisprudence of results. For example, if a rule of commercial law were in question, the search should be for the rule that best accords with and gives effect to sound business practice. Rudolf von Ihering titled this jurisprudence *Wirklichkeitsjurisprudenz*. Roscoe Pound, <u>Mechanical Jurisprudence</u>, 8 Colum. L. Rev. 605, 608, 610 (1908). <u>See also</u> Rudolf von Ihering, <u>Der Geist des römischen Rechts</u> (1907). Whatever had been possible procedural restrictions on

21

appeal at one time in the Civil Law countries of European Nations utilizing the jurisprudence of concepts, at least until the end of the 19th century, as I will demonstrate below, we should not adhere to this now disfavored approach.

In the beginning of the 20th century the great masters of American Jurisprudence—Oliver W. Holmes, Jr., Benjamin N. Cardozo and Professor Roscoe Pound—rejected the jurisprudence of concepts for what they called a jurisprudence of *results*. Because this discussion has not often appeared in many judicial opinions, if any at all, I will summarize how the great change came about, a change in the nature of jurisprudence doctrine that our courts have now followed for almost 100 years, a change that was advocated by these great American masters.

In his classic The Nature of the Judicial Process, Cardozo explained hornbook doctrine that sometimes the source of the law to be embodied in a judgment is obvious, as when the Constitution or a statute applies. Benjamin N. Cardozo, The Nature of the Judicial Process 14 (1921). In these situations, the judge simply obeys the constitutional or statutory rule. But when no constitutional or statutory mandate controls, the judge must compare that case with the precedents, "whether stored in his mind or hidden in the books." Id. at 19. If the comparison yields a perfect fit, if both the law and its application are clear, the task is simple. If the law is unclear, it is necessary to "extract from the precedents the underlying principle" and then "determine the path or direction along which the principle is to move and develop, if it is not to wither and die." Id. at 28. Cardozo cautioned that decisions "do not unfold their principles for the asking. They yield up their kernel slowly and painfully." Id. at 29. He

discussed what he called the "organons" of the judicial process—the instruments by which we fix the bounds and tendencies of that principle's development and growth. He also discussed the use of history and customs, and then promulgated what in 1921 was considered a revolutionary technique of decision-making—the method of sociology, a jurisprudence that concentrated on results.

By describing the elements at work in the caldron, Cardozo was performing the valued task of a traditional common law judicial analyst. That he ranks with Oliver Wendell Holmes, Jr. as one of our greatest common law judges is scarcely now debatable. But to the extent that he developed, persuasively and gracefully, a legitimation for result-oriented jurisprudence, he became more a legal philosopher than a common law judge. He sought what *ought* to be the law, in contrast with what *is*.

Although Cardozo is not generally listed as a member of the enthusiastic corps of American Realists, he must be ranked with Holmes, as an elder statesman of that exciting cadre of reformers. In the last quarter of the 20th century critics were quick to recognize the legitimacy of decisions based on social welfare, but in 1921 Cardozo's arguments brought respectability to what theretofore had been condemned as blatant result-oriented jurisprudence. He was neither timid nor uncertain in espousing his self-styled method of sociology. To him it was "the power of social justice," and among all principles of the decision-making process, it was "the force which in our day and generation is becoming the greatest." Id. at 65-66. To him the preferred gap-filler in addressing novel questions of law was the social welfare, defined "as public policy, the good of the collective

23

body," or "the social gain that is wrought by adherence to the standards of right conduct, which find expression in the *mores* of the community." Id. at 71-72.

Accustomed as we are today to lavish reliance by prestigious courts on judicial concepts of public policy, Cardozo's statements in the early 1920s must be placed in the context of judicial process of that era. Judges then were disciples of what Rudolph von Ihering styled as a jurisprudence of concepts, and as early as 1897 American courts were being chided for undue reliance on concepts.

In The Path of the Law, Oliver Wendell Holmes gently admonished:

> I think that the judges themselves have failed adequately to recognize their duty of weighing considerations of social advantage. The duty is inevitable, and the result of the often proclaimed judicial aversion to deal with such considerations is simply to leave the very ground and foundation of judgments inarticulate, and often unconscious . . . .

O.W. Holmes, The Path of the Law, 10 Harv. L. Rev. 457, 467 (1897).

Within a decade Roscoe Pound was trumpeting the same theme: "The most important and most constant cause of dissatisfaction with all law at all times is to be found in the necessarily mechanical operation of legal rules." Roscoe Pound, The Causes of Popular Dissatisfaction with the

Administration of Justice, 40 Am. L. Rev. 729 (1906), reprinted in 8 Baylor L. Rev. 1 (1956).

Critics labeled this blind adherence to precedents, or to the rules and principles derived from them, "mechanical jurisprudence" and "slot machine justice." Pound called for a new look at what he described as "pragmatism as a philosophy of law," and stated vigorously: "The nadir of mechanical jurisprudence is reached when conceptions are used, not as premises from which to reason, but as ultimate solutions. So used, they cease to be conceptions and become empty words." Roscoe Pound, Mechanical Jurisprudence, 8 Colum. L. Rev. 605, 608, 610 (1908).

Yet founders of the Results Jurisprudence—Holmes, Pound and Cardozo—had early historical support for their advocacy. Professor Calvin Woodard of the University of Virginia suggests that their theory draws on Jeremy Bentham's utilitarian thesis:

> [T]he advocates of Sociological Jurisprudence seized upon this aspect of Bentham's message. Like him, they insisted that law has a practical, real world moral purpose, though they defined that purpose more in terms of social justice, and the balancing of social interests, than [Bentham's] "the greatest happiness of the greatest number."

Calvin Woodard, Thoughts on the Interplay Between Morality and Law in Modern Legal Thought, 64 Notre Dame L. Rev. 784, 795 (1989).

Typical of judicial utterances that had disturbed Holmes, Pound, and Cardozo was one by the Maryland Court of Appeals in 1895: "Obviously a principle, if sound, ought to be applied wherever it logically leads, without reference to ulterior results." Gluck v. Baltimore, 32 A. 515, 517 (Md. 1895). In contrast, the same year that Cardozo delivered the Storrs Lecture at Yale, he seized the opportunity to put his new theory into practice by publicly rejecting blind conceptual jurisprudence in Hynes v. New York Central Railroad Co., 131 N.E. 898 (1921). A sixteen-year-old boy had been injured while using a crude springboard to dive into the Harlem River. The trial court had ruled that if the youth had climbed on the springboard from the river before beginning his dive, the defendant landowner would have been held to the test of ordinary care, but because the boy had mounted from land owned by the defendant railroad company, the court held the defendant to the lower standard of care owed to a trespasser. Cardozo rejected this analysis, describing it as an "extension of a maxim or a definition with relentless disregard of consequences to 'a dryly logical extreme.' The approximate and relative became the definite and absolute." Id. at 900.

Cardozo's opinion in Hynes is a prototype, and his The Nature of the Judicial Process an apologia, for decision-making based on result-oriented judicial concepts of public policy. The philosophical underpinnings of what Cardozo described as the sociological or results method run counter to the widely held notion that the public policy should be formulated and promulgated only by the legislative branch of government. When judges rather than the legislators declare public policy, their declarations produce local and national tensions. When judges utilize this method, laymen and some

lawyers label them as "activists," "liberals," "loose constructionists," and a host of other epithets, gentle and otherwise.

But modern American jurisprudence is more than the results method, although its influence is strongly felt. The legal realists of the 1930s and 40s worried about what they called "the social performance of law." Those same concerns are said to lie close to the heart of the Critical Studies Movement as well. To be sure, the Law and Economics school can be said to be result-oriented, but it stresses "economic efficiency" rather than social justice.

Modern American jurisprudence constantly seeks the answers to the serious questions presented by the theories of adjudication, theories both old and new. We must keep in mind the central question put to us by the thoughtful Professor Woodard:

> What better measure is there of the value of a legal system, or indeed of the rule of law itself, than the quality of life of those subject to it? And if this approach stresses the morality of results, it also puts a huge moral burden on the hand that wields the tool of law.

Woodard, supra, at 796.

From the foregoing, in this railroad crossing case, stop, look and listen may not be cast aside as in the former era of a jurisprudence of concepts (we won't meet it on appeal because the trial judge did not meet it). In modern concepts of jurisprudence to ignore this is to run in the face of Holmes's

27

words, "I think that the judges themselves have failed adequately to recognize their duty of weighing considerations of social advantage. The duty is inevitable, . . . " And also the words of Pound: "The most important and most constant cause of dissatisfaction with all law at all times is to be found in the necessarily mechanical operation of legal rules." And finally the words of Cardozo in New York Central Railroad: you should not extend "a maxim or a definition with relentless disregard of consequences to 'a dryly logical extreme.'"

By 1974 Harry W. Jones, Cardozo Professor of Law at Columbia Law School, would teach us:

> Law is not a form of art for art's sake; its ends-in-view are social, nothing more and nothing less than the establishment and maintenance of a social environment in which the quality of human life can be spirited, improving and unimpaired.

Harry W. Jones, An Invitation to Jurisprudence, 74 Colum. L. Rev. 1023, 1025 (1974)

The Pennsylvania stop, look and listen rule was an omnipresent brooding presence in this case. I will not put my head in the sand and ignore it.

## VIII.

The next issue is whether the District Court properly granted Norfolk Southern's motion for summary judgment on Zimmerman's excessive-speed claim. I agree with the

28

majority opinion insofar as it holds that excessive-speed claims are preempted when a train is traveling *below* a federally mandated speed limit. Majority Opinion 14. I also agree with the majority that 49 C.F.R. § 213.9 creates federally mandated speed limits by establishing "the degree of care that railroads must exercise on each class of tracks: trains should not exceed ten miles per hour on Class 1 tracks, twenty-five miles per hour on Class 2 tracks, and so on." Majority Opinion 16.

I disagree, however, with the majority's holding that Zimmerman's excessive-speed claim is not preempted by § 213.9 because he has raised a triable issue of fact as to whether the track at the Diller Avenue crossing was a Class 1 track—the only class of track for which the train's speed would have exceeded the federally mandated limit under § 213.9, and the only class of track for which Zimmerman's claim would therefore not be preempted by § 213.9. I would hold that Zimmerman failed to provide *any* competent evidence that the tracks were classified as Class 1 because, as the District Court held, the limited evidence Zimmerman sought to introduce for this purpose was privileged under either 23 U.S.C. § 409 or 49 U.S.C. § 20903. Zimmerman is left without any competent evidence to rebut Norfolk Southern's testimony that the track was either Class 2 or Class 3, which both have maximum speed limits greater than the speed the train was traveling, and therefore Zimmerman's excessive-speed claim is preempted by § 213.9 and summary judgment was proper.

A.

29

Zimmerman sought to introduce two groups of documents to challenge Norfolk Southern's testimony that the track at issue was a Class 2 or Class 3 track: inventory documents from the Department of Transportation's National Crossing Inventory and accident reports dating back to 1975. I would hold that the inventory documents were privileged under 23 U.S.C. § 409 and that the accident reports were privileged under 49 U.S.C. § 20903.

B.

The first group of documents Zimmerman sought to introduce were nine documents titled "U.S. DOT-Crossing Inventory Information." Eight of these documents state a maximum permissible speed of 10 miles per hour for trains crossing Diller Avenue, and one states a maximum permissible speed of 15 miles per hour. If admitted into evidence, these documents would create a genuine issue of material fact as to whether the operation of the train was negligent per se, given that it was traveling at a speed of 24 miles per hour at the time of the collision. Furthermore, they would establish the possibility that Zimmerman's excessive-speed claim is not preempted by § 213.9 because they would demonstrate that Norfolk Southern may have exceeded the federally mandated speed limit set for the Diller Avenue crossing.

To determine whether the Inventory documents are admissible, both the majority and I must analyze carefully 23 U.S.C. § 409, which states:

> [R]eports, surveys, schedules, lists, or data compiled or collected for the purpose of

30

identifying, evaluating, or planning the safety enhancement of . . . railway-highway crossings, pursuant to sections 130, 144, and 148 of this title or for the purpose of developing any highway safety construction improvement project which may be implemented utilizing Federal-aid highway funds *shall not be subject to discovery or admitted into evidence* in a Federal or State court proceeding or considered for other purposes in any action for damages arising from any occurrence at a location mentioned or addressed in such reports, surveys, schedules, lists, or data.

(emphasis added).

The Supreme Court teaches that § 409 was enacted to facilitate programs including the Crossings Program promulgated by 23 U.S.C. § 130. See Pierce Cnty. v. Guillen, 537 U.S. 129, 133-134 (2003). The Crossings Program was enacted to assist states in identifying highways and railways in need of improvements. It makes funds available to states for the "cost of construction of projects for the elimination of hazards of railway-highway crossings." § 130(a). To participate, states must "conduct and systematically maintain a survey of all highways to identify those railroad crossings which may require separation, relocation, or protective devices, and establish and implement a schedule of projects for this purpose." § 130(d). Because participation in these programs required states to disclose safety-related information that could expose them to civil liability, such as information related to accident sites, Congress adopted § 409 to encourage disclosure. See Guillen, 537 U.S. at 133-134.

31

Additionally, in <u>Guillen</u>, the Supreme Court concluded that § 409 protected all data collected by an agency in support of the Federal Hazard Elimination Program ("§ 152"), *regardless of the source of the information*. <u>See</u> <u>id.</u> at 145-146. At the time, § 152 appeared within the text of § 409 as a program falling within the statute's coverage, just as § 130 appeared and still appears to this day within the text of § 409. For this reason, I would hold that the teachings of <u>Guillen</u> apply equally to § 130 programs and would hold that § 409 protects all data collected by an agency in support of § 130, regardless of the source of information. Because I conclude that the inventory documents sought to be introduced here fall within § 409, they are inadmissible and I would affirm the District Court's holding.

C.

Because § 409 does not protect information that was compiled, collected, obtained and utilized for purposes unrelated to one of the three programs identified in the statute, <u>see</u> <u>Guillen</u>, 537 U.S. at 146, the relevant inquiry here, in determining whether § 409 applies, is whether the information in the inventory documents was collected, generated or compiled for the purpose of pursuing the objectives of the federal program promulgated by § 130.

I agree with the District Court that the inventory documents were "surveys," which were "compiled and collected" "for the purposes of . . . planning the safety enhancement of railway-highway crossings," and done pursuant to § 130, which requires states to "conduct and systematically maintain a survey of all highways to identify

32

those railroad crossings which may require [improvements] . . . ." See App. 00047.

The inventory documents at issue were compiled and collected for the U.S. DOT National Highway-Rail Crossing Inventory Program, which began in the 1970s after the passage of The Federal-Aid Highway Act. "The purpose of the U.S. DOT National Highway-Rail Crossing Inventory Program is to provide for the existence of a national inventory database that can be . . . used . . . for planning and implementation of crossing improvement programs . . . ." Federal Railroad Administration, U.S. DOT National Highway-Rail Crossing Inventory: Policy, Procedures and Instructions for States and Railroads 3 (2007), http://www.fra.dot.gov/downloads/safety/RXIPolicyInstructio ns0807.pdf [hereinafter "2007 Manual"]. Moreover, the current Program Manual instructs railroads to send their completed inventory documents to the appropriate "State Inventory Contact" so that the last portion of the form may be completed by the state. 2007 Manual 6. The state's participation in the Inventory Program, and its use of the same forms used by the railroads, provides further support that the inventory documents are privileged under § 409.

Congress clearly and emphatically intended by enacting § 409 to prohibit this type of federally required record keeping from being used as a "tool in litigation." See Guillen, 537 U.S. at 146 (explaining that Congress amended § 409 to include "or collected" in order "to make clear that § 152 [a section formerly included in the text of § 409 as § 130 is now included] was not intended to be an effort-free tool in litigation against state and local governments."). Additionally, because the inventory documents at issue were "compiled and

33

collected" for the U.S. DOT National Highway-Rail Crossing Inventory Program, the purpose of which is "to provide for the existence of a national inventory database that can be . . . used . . . for planning and implement[ing] . . . crossing improvement programs," I would hold the documents were collected, generated or compiled for the purposes of § 130 and would affirm.

D.

In addition to the inventory documents, Zimmerman attempted to introduce ten accident reports involving the Diller Avenue crossing, five of which involve accidents from the 1970s and state the track is a Class 1 track. I would hold that The District Court correctly determined that these accident reports were privileged pursuant to 49 U.S.C. § 20903, which states in part:

> No part of an accident or incident report filed by a railroad carrier under section 20901 of [Title 49] . . . may be used in a civil action for damages resulting from a matter mentioned in the report.

A railroad, pursuant to 49 U.S.C. § 20901(a), is required to file a monthly report with the Secretary of Transportation "on all accidents and incidents resulting in injury or death to an individual," and the parties do not dispute that the reports at issue here were filed pursuant to § 20901.

The majority opinion limits this privilege to encompass only the report filed in direct response to

34

Zimmerman's accident while leaving open the possibility that all other reports—whether filed before or after Zimmerman's accident—may be used in his lawsuit against Norfolk Southern. Such a holding defeats the general purpose of privileges such as § 20903, which promote public safety by encouraging candor. I would hold, therefore, that all the accident reports Zimmerman seeks to introduce fall within the § 20903 privilege.

E.

Without the inventory documents and accident reports, there is no evidence that the tracks at Diller Avenue were classified as Class 1, with a maximum permissible speed of 10 miles per hour. And, because it is undisputed that the train was traveling at 24 miles per hour—which is permissible on both Class 2 and Class 3 tracks—no genuine issue of material fact exists as to whether the train exceeded the speed permissible under § 213.9. Therefore, Zimmerman's claim of excessive speed is preempted and summary judgment was proper.

\* \* \* \* \*

I would conclude that the District Court properly held that Zimmerman's claims of negligence based on (1) inadequate signals and (2) excessive speed are preempted. I would conclude also that the District Court did not err in granting summary judgment in favor of Norfolk Southern for Zimmerman's claims that the railroad failed to (3) maintain a reasonably safe crossing and (4) provide adequate sight distance, because Zimmerman failed to establish a prima facie negligence claim, and therefore no genuine issue of material

35

fact exists.

Finally, I would hold that the District Court properly concluded that Zimmerman's excessive-speed claim is preempted by § 213.9 because Zimmerman cannot establish that there is a material issue of fact as to whether the train's speed exceeded the federal limit permitted at the Diller Avenue crossing without the inventory documents and accident reports, which I would hold are privileged. Summary judgment was therefore appropriate and I would affirm the District Court's judgment in all respects.